## ISBRANDTSEN CO., Inc. v. UNITED STATES et al.

United States District Court
S. D. New York.
March 21, 1951.

The earlier stage of this litigation is reported in D.C., 81 F.Supp. 544. As the statement of facts therein makes clear, Eastbound Conference Agreement No. 4490—from its initial approval by the U.S. Maritime Commission on August 25, 1935, through subsequent amendments as approved by the Commission down to the present—has provided for contract-noncontract rates, although the Conference has not availed itself generally of this power in the past. Agreement No. 7920–1, to which the Westbound Conference is a party, as approved by the Commission on August 24, 1948, similarly undertakes to authorize the use of contract-noncontract rates in the Westbound trade. On October 1, 1948, the defendant carriers sent notices

to all known shippers in the North Atlantic trade that effective November 1, 1948, the exclusive patronage contract-noncontract rate system would be inaugurated; the contract rates were to be the then prevailing freight rates, but shippers who refused to enter into contracts to ship with the conference lines exclusively when those lines could provide transportation, were to be charged noncontract rates to be fixed by an arbitrary differential at a level 20% to 30% higher than the contract rates. On Isbrandtsen's motion, this court granted a temporary injunction, restraining the defendant carriers from instituting the exclusive patronage system, conditioned upon Isbrandtsen's diligent prosecution before the Maritime Commission of a complaint challenging the validity of these Conference agreements.

Subsequently, Isbrandtsen filed a complaint with the Maritime Commission. The United States (by the Attorney General) and the Secretary of Agriculture intervened in support of the complaint. Evidence was taken before a trial examiner who made two reports. Before the Commission finally acted on these reports, it was abolished.

Its successor, the Federal Maritime Board, thereafter made a decision and order on December 1, 1950, which will be found in 3 F.M.B. ——, approving the contract-noncontract rate provisions of the conference agreements and dismissing Isbrandtsen's complaint.

Isbrandtsen then filed in this court an amended complaint, which referred to the Board's order and asked that it be enjoined. The United States (by the Attorney General) appeared, and the Secretary of Agri-culture was permitted to intervene.[1] They argued in support of the injunction. The Board and the conference carriers appeared, moved to dismiss the suit, and argued in opposition to the proposed injunction.

John J. O'Connor, Washington, D. C. (William L. McGovern, Washington, D. C., of counsel), for plaintiff.

Burlingham, Veeder, Clark & Hupper, New York City (Roscoe H. Hupper and Burton H. White, New York City, of counsel), for North Atlantic Continental Freight Conference et al.

Paul D. Page, Jr. and George F. Galland, Washington, D. C., for Federal Maritime Board.

Gareth M. Neville and Robert Murray, Washington, D. C. (Malcolm Hoffman, of counsel), for Department of Justice.

Henry A. Cockrum, for Secretary of Agriculture.

Before FRANK, Circuit Judge, and RYAN and SAMUEL H. KAUFMAN, District Judges.

FRANK, Circuit Judge.

1. The plaintiff, the Attorney General, and the Secretary of Agriculture contend that in no circumstances can a dual-rate provision (i. e., an exclusive patronage, or dual-rate, or contract-noncontract provision) in a conference agreement be valid under 46 U.S.C.A. § 812, Third.[2] We need not, and do not, decide whether or not that contention is sound.[3] For the purposes of this decision, we shall assume that, as the Board contends, in some circumstances the Board may, pursuant to 46 U.S.C.A. § 814,[4] approve a conference agreement containing

---

1. As to the appearance by the Attorney General, see 46 U.S.C.A. § 830, 28 U.S.C.A. §§ 2322, 2323. As to the intervention of the Secretary of Agriculture, see 7 U.S.C.A. § 1622(j); 5 U.S.C.A. §§ 1005 (a) and 1009(a); cf. Associated Industries of N. Y. v. Ickes, 2 Cir., 134 F.2d 694, 711–712.

2. It reads: "No common carrier by water shall, directly or indirectly, * * *. Third. Retaliate against any shipper by refusing, or threatening to refuse, space accommodations when such are available, or resort to other discriminating or unfair methods, because such shipper has patronized any other carrier or has filed a complaint charging unfair treatment, or for any other reason."

3. In an Appendix to this opinion, Judge FRANK has set forth some of the arguments for and against that position. Judges KAUFMAN and RYAN do not participate in that Appendix.

4. It reads:
   "Every common carrier by water, or other person subject to this chapter, shall

such a provision. For even so, we think that, on the record now before us, the dual-rate provision in each of these conference agreements is invalid.

2. In effect, the Board's position is that such a provision may be authorized under Sec. 814 unless the Board finds that it is "unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports".[5] But the Board has made a finding, and the evidence before the Examiner shows that the announced contract and noncontract rates of the conference carriers, acting pursuant to the dual-rate provisions of the conference agreements, were such that the spread between those rates was arbitrary. The conference carriers thus interpreted the dual-rate provisions of the conference agreements as authorizing such an arbitrary spread, and the Board

held valid the dual-rate provisions thus interpreted.

The effect of the Board's order is to approve the dual-rate provisions which permit unreasonable spreads between the contract and noncontract rates. We hold such dual-rate provisions to be unlawfully discriminatory between shippers, and we therefore set aside the Board's order.

3. In Swayne & Hoyt Ltd. v. United States, 300 U.S. 297, 303, 57 S.Ct. 478, 481, 81 L.Ed. 659, the Court said that a differential, pursuant to a conference agreement, between contract and noncontract rates was "prima facie discriminatory since the two rates were charged for identical services and facilities * * *."[6] As the Board, in justifying its decision, refers to decisions of its predecessors,[7] it is

file *immediately with the commission a true copy* * * * of every agreement, with another such carrier or other person subject to this chapter, * * * to which it may be a party or conform in whole or in part, *fixing or regulating* transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. * * *

"The commission may by order disapprove, cancel, or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors or to operate to the detriment of the commerce of the United States, or to be in violation of this chapter, and shall approve all other agreements, modifications, or cancellations. * * *

"All agreements, modifications, or cancellations made after the organization of the commission shall be lawful only when and as long as approved by the commis-

sion, and before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation.

"Every agreement, modification, or cancellation lawful under this section shall be excepted from the provisions of sections 1–11 and 15 of Title 15, and amendments and Acts supplementary thereto. * * *"

5. We discuss infra this interpretation of Sec. 814.

6. Cf. Atlantic Refining Co. v. Ellerman & Bucknalls S.S. Co., 1 U.S.S.B. 242, 249–259. Cf. I.C.C. v. Mechling, 330 U.S. 567, 67 S.Ct. 894, 91 L.Ed. 1102; Alabama Great Southern R. Co. et al. v. U. S., 340 U.S. 216 at page 227, 71 S.Ct. 264.

7. (a) The Shipping Act, in 1916, established the United States Shipping Board, and gave it powers conferred by many sections of that Act. 46 U.S.C.A. § 801 et seq.

(b) Executive Order No. 6166 dated June 10, 1933, 5 U.S.C.A. §§ 124–132 note, abolished the Board and transferred its powers to the Department of Commerce.

(c) The Act of June 29, 1936, 49 Stat. 1987, transferred those powers to the United States Maritime Commission.

(d) The President, by Reorganization Plan No. 21 of 1950, 46 U.S.C.A. § 1111 note, with the acquiescence of Congress created the Federal Maritime Board and transferred to it certain powers of the

well to note that in Rawleigh v. Stoomvart, 1 U.S.S.B. 285, 293, the Shipping Board said that a contract-noncontract clause in a conference agreement would violate the statute "where the spread is such in amount as to constitute unlawfulness." [8]

4. Here, then, the complainant, before the Board, made out a case of unlawful discrimination by presenting the agreements containing the dual-rate provisions together with proof of the unreasonableness of the spread between the announced contract and noncontract rates. For a witness called by the carriers, Andrews, Secretary since 1935 of one of the two Conferences,[9] testified on cross-examination, that "generally the noncontract rates were fixed at a differential of approximately 20% above the contract rates" and that: "I don't think the making of rates by differential is a proper basis, for that is an arbitrary basis." [10] No evidence was offered contradicting this statement of the arbitrary nature of the differential.

The trial examiner made an initial report to the effect that the dual-rate provisions were not illegal per se. After receiving this report, the Commission (later superseded by the Board) issued a supplemental order returning the case to the examiner with directions to make findings as to whether the exclusive-contract provisions of this case "(1) are unjustly discriminatory or unfair as between * * * shippers, or (2) operate to the detriment of the commerce of the United States, or (3) are in violation of the provisions of the Shipping Act. * * *." The order also directed the examiner to rule upon the proposed findings of fact submitted by the complainant.[11]

The examiner in his second report, pursuant to this order, found, as proposed by complainant, that the noncontract rates "were fixed by means of an arbitrary differential at a level 20% to 30% higher than the currently existing scale." [12] (As the testimony quoted in footnote 10 shows, the

---

United States Maritime Commission, including those set forth in 46 U.S.C.A. §§ 812–819, 821–832.

8. This case is further discussed, infra.

9. He is Secretary of the North Atlantic Continental Freight Conference.

10. His testimony in full on this point is as follows:

"Q. Mr. Andrews, in establishing your contracts, (sic) non-contract rate system, it is my understanding that it was proposed to continue in effect after November 1st, the tariff that had been largely in existence prior to that date, but that after November 1st the rates in the present existing tariff would then become the contract rates, is that correct? A. Yes. We were establishing as a contract basis the tariff rates which had been in effect for some time.

"Q. How did you calculate what the non-contract rates would be? Were they arranged on a basis pretty much— A. (Interrupting) We followed the same pre-war practice that had been in effect in most of the trans-Atlantic trades, of substantially 20 per cent over the contract basis, rounding the figures out to the nearest nickel.

"Q. In other words, in general terms, the non-contract rates were going to be fixed on a differential of approximately 20 per cent above the contract level?

A. That has been the basis pre-war, and the basis in effect to all of the European freight where there is a contract system.

"Q. Well, now, is it your own view that the rates which are fixed on a differential basis, either above or below other rates, are reasonable? A. We didn't fix them on a, so to speak, differential basis. We fixed them at specific rates in the tariff.

"Q. I understand that, but I also understand that generally the non-contract rates were fixed at a differential of approximately 20 per cent above the contract rates? A. That is correct.

"Q. And I am asking you whether in your judgment the fixing of any rate scale at any time on a differential basis is a reasonable method of making rates? A. I don't think the making of rates by differential is a proper basis, for that is an arbitrary basis."

11. See the Commission's Rule, 46 C.F.R. 201.191.

12. This finding reads in full as follows: "Shippers were informed that failure to sign such a contract would entail application to their shipments by respondent's lines after November 1, 1948 of noncontract rates which were fixed by means of an arbitrary differential at a level 20% to 30% higher than the currently existing scale."

announced contract rates were fixed by adopting that scale.) The Board did not in precise terms adopt this finding. But, in oral argument before the court, counsel for the Board construed its decision as accepting the examiner's findings in so far as they were not inconsistent with its own report. There is nothing in the Board's report inconsistent with this finding of the examiner.[13] Accordingly, we conclude that the Board made this finding its own.

It should be added that, according to the evidence, the Conferences propose to offer contract rates to the federal government and its agencies, which ship by the conference carriers many tons of commodities, without requiring those shippers, as distinguished from private shippers, to sign exclusive patronage contracts.

■ 5. We have, then, a specific finding, supported by the evidence, of a "constitutive" or "pivotal" or "basic" fact, i. e., that the spread between the rates announced, in accordance with the dual-rate provisions, was arbitrarily determined.[14] This specific finding is inconsistent with

---

13. Moreover, the Board in its brief filed with us, candidly interprets the Board's decision as holding, in effect, that the purpose of the dual-rate provisions was, if possible, to bring about a condition in which an independent carrier would be compelled (through loss or threatened loss of profits) either to join the Conference or go out of business.

The Board's brief says: "The contract system should be frankly recognized as a device tending towards the monopolization of ocean commerce in particular trades by the members, collectively, of conferences which serve those trades. We use the word 'monopolization' with no ideological overtones, but merely in its dictionary sense, which is the obtaining or assumption of 'exclusive possession or control.' Whether the contract system in a particular case actually has the effect of producing a complete monopoly (i. e., control of a trade) depends upon how well it works; admittedly, it is monopolistic in purpose. The extent to which it is monopolistic in effect depends upon how successfully that purpose is achieved * * *. The record warrants the conclusion that if a contract system is wholly effective, it will result in a complete monopoly in the sense that all cargo moving in a trade where the system is used, will move in ships of conference carriers. Necessarily, in these circumstances, there would be no service by independent operators * * *. In considering the system itself (precedent to examination of specific contract provisions), we feel that this court should assume that the conference contracts are in fact effective; that shippers sign them in substantial numbers, voluntarily or as a choice of evils; that they exclude Isbrandtsen from carrying the freight of all shippers who sign; and that the contracts seriously restrict Isbrandtsen's access to cargoes for its ships, and will continue to do so if, and as long as, the conferences employ the contract system and Isbrandtsen remains a non-member."

14. The Board approved the conference agreements without holding hearings or taking evidence or making findings. It might be argued that, consequently, the first time the Board considered making an "order" concerning the validity of those agreements was in connection with the complaint proceedings involved in the instant case. Cf. State of North Carolina v. United States, 325 U.S. 507, 517, 65 S.Ct. 1260, 89 L.Ed. 1760. Were that argument accepted, it might then be argued that the order made in those proceedings is subject to the provisions of 5 U.S.C.A. § 1006(c), so that the burden of proving the validity of the agreements was on the proponent of the order, i. e., the carriers. See also the Board's rule as to the burden of proof, 46 C.F.R. § 201.122.

After approvals of the conference agreements in suit, the Board's predecessor, the Maritime Commission, promulgated an order, effective September 8, 1949, which is still in force and which provides as follows: When a proposed agreement is filed, the Board publishes a notice thereof, which advises interested parties that, within twenty days, they may request a hearing. The Board may then, in its discretion, order the holding of a hearing. If such a hearing is held, the burden of proof is obviously on the proponents of the approval. Of the Commission's order of September 8, 1949, counsel for the Board, in a letter to this court, stated: "General Manager's Order No. 106 was not published in the Federal Register inasmuch as it constituted a direction to the Commission's (now the Board's) staff on internal procedure, and in particular as to the manner in which notice should be given to the public." Cf. Newman, "Government and Ignorance —Progress Report on Publication of Fed-

the Board's finding, as an "ultimate" fact and in the very words of the statute, that the "dual rate system * * * is not unjustly discriminatory or unfair as between * * * shippers." That latter finding, since it cannot be rationally inferred in the face of the specific finding of a "basic" fact, cannot stand up.[15] Dual-rate provisions which authorize arbitrary differentials are obviously not reasonable.[16] For arbitrary conduct means unreasoned or unreasonable conduct, i. e., without reference to an adequate determining principle or standard;[17] and unreasonable discrimination is the equivalent of "unjust" discrimination.[18] Consequently, here the rates proposed to be charged shippers who do not sign contracts are unreasonably, and therefore unjustly, discriminatory; and the dual-rate provisions which permit such rates are invalid.

6. The Board's predecessors in some of their decisions have said that the validity of a dual-rate provision in a conference agreement is a question which must be determined by the facts in each case.[19] It may be urged, however, that some of those decisions contain intimations that sufficient facts exist to validate such a provision, as part of a conference agreement, if it appears merely that any carrier may join the conference and that the dual-rate provision will create "stability" by tending to drive competing non-conference carriers into the conference or out of business.[20] It is by no means clear that such administrative interpretations, even if un-

eral Regulations", 63 Harvard L.R. 929.

But any arguments to the effect that the carriers here had the burden are academic since, if plaintiff here had the burden, plaintiff discharged it.

15. Baltimore & O. R. Co. v. United States, D.C., 22 F.Supp. 533, 537 (per L. Hand, J.); State of Florida v. United States, 282 U.S. 194, 215, 51 S.Ct. 119, 75 L.Ed. 291; United States v. Caroline Carriers Corp., 315 U.S. 475, 489, 62 S.Ct. 722, 86 L.Ed. 971; United States v. Pierce Auto Lines, 327 U.S. 515, 533, 66 S.Ct. 687, 90 L.Ed. 821; United States v. Baltimore & O. R. Co., 293 U.S. 454, 463, 55 S.Ct. 268, 79 L.Ed. 587; United States v. Chicago, M. St. P. & P. R. Co., 294 U.S. 499, 506, 510–511, 55 S.Ct. 462, 79 L.Ed. 1023; see also 5 U.S.C.A. § 1007 (b).

A discrepancy between the special finding of a basic fact and a finding of an ultimate fact may perhaps be compared with a discrepancy between a jury's answers to interrogatories and its general verdict. Cf. Orvis v. Higgins, 2 Cir., 180 F.2d 537, 539, as to the resemblance between an administrative finding and a jury's special verdict.

16. The plaintiff urges that the contract rates themselves are unreasonable since they are the rates established during World War II to cover unusual costs then existing. We need not, and do not, consider this contention.

In this connection, however, there may be noted Lough v. Outerbridge, 143 N.Y. 271, 38 N.E. 292, 294, 25 L.R.A. 674, on which the Board relied in interpreting the statute. There, in 1894, before the statute, the court held that, in special cir-

cumstances, it was lawful for a water-carrier to grant lower rates to shippers making exclusive patronage contracts. But the court based its decision on the fact that there was an express finding by the trial court that the non contract rates were reasonable, so that there was "no refusal to carry for a reasonable compensation", and no "detriment of the public, by exacting unreasonable charges." The court said: "If the general rates are reasonable, a deviation from the standard by the carrier in favor of particular customers, for special reasons not applicable to the whole public, does not furnish to parties not similarly situated any just ground for complaint. * * * Special favors in the form of reduced rates to particular customers may form an element in the inquiry whether, as a matter of fact, the standard rates are reasonable or otherwise."

17. See e. g., United States v. Carmack, 329 U.S. 230, 243, and note 14, 67 S.Ct. 252, 91 L.Ed. 209; see also Zweig v. United States, D.C., 60 F.Supp. 785; In re Rogers, D.C., 47 F.Supp. 265, 266; United States v. Lotempio, D.C., 58 F.2d 358, 360; Fox Film Corp. v. Trumbull, D.C., 7 F.2d 715, 727.

18. See, e. g., Mitchell v. United States, 313 U.S. 80, 94, 97, 61 S.Ct. 873, 85 L. Ed. 1201; National Surety Corp. v. Mullins, 262 Ky. 465, 90 S.W.2d 707, 708.

19. Gulf International Contract Rates, 1 U.S.S.B., 524, 530; Phelps Bros. & Co., Inc. v. Cosulich-Societa, etc. 1 U.S.M.C. 634, 639.

20. How much stability the particular dual-rate provisions in this case would furnish

ambiguous, uniform and consistent, would be tenable, in the light of the provision in Sec. 814 as to unjustly discriminating provisions in conference agreements.[21] But we need not deal with that question. For (perhaps due to the way in which the statutory powers have been frequently shifted from one agency to another) the decisions of the Board (none of which approving a dual-rate provision has heretofore come to court) have lacked uniformity and consistency;[22] and, in such circumstances, ad-

has been questioned. Without passing upon that question, we note the following: The examiner found, "With regard to the respondent carriers' obligations under the contract, the contract provided that respondents agreed to furnish the merchant at contract rates 'space in such vessels as they may respectively load at said loading ports for transportation and dispatch at the ports desired, provided that suitable unbooked space is available therein when the merchant makes application.'" This apparently means that, to a shipper who signs an exclusive patronage contract, the conference carriers agree to supply no transportation facilities, except as the conference members may see fit to provide them from time to time. Andrews, called by the carriers as a witness in the Board's hearing, testified that, if the conference carriers provided a contract shipper with no space, the contracting shipper would be free to ship via an independent, non-conference, carrier. But the very purpose of the dual-rate provision is, if possible, to compel independent shippers to join the conference or go out of business. If, then, the dual-rate provision is successful, there will be no independent carriers. In that event, a shipper who signs a contract will apparently receive only such carrying space as the conference members choose to supply. Plaintiff argues that this shows that the dual-rate provision will not assure "stability" to shippers. The Board, in its opinion, intimated at one point that shippers endorsed the dual-rate provisions but, at another point, said: "The conferences realize that * * * something more than voluntary shipper cooperation must be agreed to. The dual-rate system is the device which has been developed for that purpose." It added: "Shippers have testified in this case that they deem the stability of rates and regularity of service which a conference can offer are worth the price measured in terms of freight rates." However, two private shippers intervened in the Board's proceeding to protest against the dual-rate provisions in the agreements in suit. So, too, did the Secretary of Agriculture, as the representative of many other shippers; see infra.

21. See, e. g., Neuberger v. Commissioner of Internal Revenue, 311 U.S. 83, 89, 61 S.Ct. 97, 85 L.Ed. 58; Koshland v. Helvering, 298 U.S. 441, 447, 56 S.Ct. 767, 80 L.Ed. 1268; Alaska Steamship Co. v. United States, 290 U.S. 256, 264, 54 S.Ct. 159, 78 L.Ed. 302; United States v. Missouri Pac. R. Co., 278 U.S. 269, 280, 49 S.Ct. 133, 73 L.Ed. 322; United States v. Johnson, 173 U.S. 363, 378, 19 S.Ct. 427, 43 L.Ed. 731; Iselin v. United States, 270 U.S. 245, 251, 46 S.Ct. 248, 70 L.Ed. 566; United States v. Tanner, 147 U.S. 661, 663, 13 S.Ct. 436, 37 L.Ed. 321; United States v. Graham, 110 U.S. 219, 221, 3 S.Ct. 582, 28 L.Ed. 126; Webster v. Luther, 163 U.S. 331, 342, 16 S. Ct. 963, 41 L.Ed. 179. See annotations in 73 L.Ed. 339–343 and 84 L.Ed. 43–46.

22. In Eden Mining Co. v. Bluefields Fruit & S. S. Co. 1 U.S.S.B. 41, decided in 1922, not long after the enactment of the statute, the Shipping Board held it unlawful as "unjustly discriminatory," for a carrier in foreign commerce to use the contract-noncontract device. Citing Secs. 16 and 17, 46 U.S.C.A. §§ 815 and 816, the Shipping Board said: "It is evident that the purpose of Congress in enacting these provisions of the statute was to impose upon common carriers within the purview thereof the duty of charging uniform rates to all shippers receiving a similar transportation service. The duty of the respondent under these sections was to serve the public impartially, and we think the language used in Western Union Tel. Co. v. Call Pub. Co., 181 U.S. 92 [21 S.Ct. 561, 564, 45 L.Ed. 765], in dealing with a similar statute, is entirely applicable to the case in hand. The court there said: 'All individuals have equal rights both in respect to service and charges. Of course, such equality of right does not prevent differences in the modes and kinds of service and different charges based thereon. * * * But that principle of equality does forbid any difference in charge which is not based upon difference in service, and, even when based upon difference of service, must have some reasonable relation to the amount of difference, and cannot be so great as to produce an unjust discrimination.' From the facts of record in the

ministrative interpretations have little weight.[23]

What is even more to the point, in each of the cases in which such intimations occurred, there was absent any specific finding, such as we have here, that the spread between the contract and noncontract rates, permitted by the dual-rate provisions, was arbitrary. As previously noted, in Rawleigh v. Stoomvart, 1 U.S.S.B. 285, the Shipping Board said that a dual-rate provision in a conference agreement is invalid if it authorizes a spread which is unlawful. In no subsequent decision by the Board, or by any of its predecessors, has that ruling been rejected. In the Rawleigh case, however, the Shipping Board sustained such a provision without considering the spread. But it did so only because, as the Board's opinion, 1 U.S.S.B. at page 288 discloses, there the complainant had explicitly stated: "The question of rates from our viewpoint * * *, or the spread between them, is entirely immaterial and outside the scope of this proceeding." For that reason, the Board held, 1 U.S.S.B. at pages 288, 293 that that particular proceeding "does not

present for determination anything other than the lawfulness in the trade concerned of the contract-noncontract rate practice *itself, apart from and independent of any factor of quantum of spread,*" and "involves no issue respecting anything other than the lawfulness of the contract rate practice per se." But the instant case is in that respect clearly distinguishable: Here the complainant proved before the Board that the spread was not reasonable; the Board, by its supplemental order, directed the examiner to rule upon findings of fact proposed by the complainant; the examiner, in conformity with that direction, explicitly found that the differential between the rates was arbitrary; and the Board has adopted that finding.

■■ 7. It might conceivably be suggested that, nevertheless, the Board properly ignored the unreasonableness of the spread, authorized by the dual-rate provisions, because plaintiff, before the Board, attacked the dual-rate provisions not for such unreasonableness, but on the sole ground that they are unlawful per se under Sec. 812, Third. However, plaintiff, before

case before us it is manifest that the transportation service furnished the complainants and contract shippers was in all respects identical." The Board also said: "It should be here remarked, however, that we do not decide whether under that act the according of lower rates to those shippers who contract to confine their shipments to a certain carrier or carriers are lawful when based upon *regularity of consignments, number of shipments, or quantity of merchandise furnished for transportation,* as in the instant case no such question is presented for determination."

Some eleven years later, in Rawleigh v. Stoomvart, 1 U.S.S.B. 285, 290 (1933), it was indicated that the Eden rule applied exclusively to the case of a single carrier and was inapplicable to a conference agreement. However, some two years later, in Intercoastal Investigation, 1 U.S.S.B. 400, 452 (1935), the Shipping Board Bureau rejected this distinction. Then, some four years after that, in Contract Routing Restrictions, 2 U.S.M.C. 220, 226–227 (1939), the Maritime Commission cited the Eden case as applicable to a conference agreement. But now, eleven years after that case, the Federal

Maritime Board, in the instant case, once more indicates that the Eden rule applies to the case of a single carrier only.

Again, Menacho v. Ward, C.C., 27 F. 529, has been variously treated: It was relied upon in the Eden case, supra (1922); treated as having been made irrelevant by the statute in Pacific Coast European Conference, 3 U.S.M.C. 11, 15–16 (1947); and, in the instant case, cited by the Board (1950) as authority in interpreting the statute.

23. United States v. Missouri Pac. R. Co., 278 U.S. 269, 280, 49 S.Ct. 133, 73 L.Ed. 322; Burnet v. Chicago Portrait Co., 285 U.S. 1, 16, 52 S.Ct. 275, 76 L.Ed. 587; Alexander v. Cosden Pipe Line Co., 290 U.S. 484, 498, 54 S.Ct. 292, 78 L.Ed. 452; Estate of Sanford v. Commissioner of Internal Revenue, 308 U.S. 39, 49, 60 S. Ct. 51, 84 L.Ed. 20; American Surety Co. of New York v. Bethlehem Nat. Bank, 314 U.S. 314, 319, 62 S.Ct. 226, 86 L. Ed. 241; United States v. Healey, 160 U.S. 136, 145, 16 S.Ct. 247, 40 L.Ed. 367; Merritt v. Cameron, 137 U.S. 542, 551–552, 11 S.Ct. 174, 34 L.Ed. 772. See annotations in 73 L.Ed. 345–349, and 84 L.Ed. 47–50.

the Board, did inject the issue of the authorized spread by requesting the finding as to the arbitrariness of the differential.

There is this further consideration. In United States Navigation Co. v. Cunard S. S. Co., 2 Cir., 50 F.2d 83, 89, the court, interpreting Sec. 814, said: "The Board shall approve such agreements as it does not find 'to be unjustly discriminatory or unfair.'" In oral argument before us, counsel for the Board seemed to suggest a different interpretation, i. e., that at least in initially approving a conference agreement under Sec. 814, the Board has no obligation whatever to inquire into unjust or unfair discrimination; need make no finding on that score; and, only if it does choose to inquire and also does choose to find unjust or unfair discrimination, need it disapprove or modify the agreement on that ground. This is a somewhat surprising contention, to be contrasted with the following views of Commissioner Aitchison of the Interstate Commerce Commission concerning the obligations of administrative agencies: "They are not expected merely to call balls and strikes, or to weigh the evidence submitted by the parties and let the scales tip as they will. The agency does not do its duty when it merely decides upon a poor or nonrepresentative record. As the sole representative of the public, which is a third party in these proceedings, the agency owes

the duty to investigate all the pertinent facts, and to see that they are adduced when the parties have not put them, in * * *. The agency must always act upon the record made, and if that is not sufficient, it should see the record is supplemented before it acts. It must always preserve the elements of fair play, but it is not fair play for it to create an injustice, instead of remedying one, by omitting to inform itself and by acting ignorantly when intelligent action is possible * * *.[24]

Even if, however, the interpretation seemingly suggested by the Board's counsel were correct, it would have no pertinence in this case. For it seems plain that here the Board, in a complaint proceeding under 46 U.S.C.A. § 821, having actually found the authorized spread arbitrary, had the duty, of its own motion, to hold the dual-rate provisions unlawful, because they authorize such a spread. See Baltimore & Ohio R. Co. v. United States, D.C., 22 F. Supp. 533, 537 (per Judge L. Hand).[25]

Nor can it be sucessfully maintained that plaintiff's complaint, in this court, is not broad enough to support our decision.[26]

8. Were it urged that the complainant, as a carrier, has no standing to complain of unlawful discrimination between shippers, the short answer (all else aside) would be that the Department of

24. Senate Subcommittee Hearings on S. 674, S. 675 and S. 918, April 29, 1941, pp. 465–466.

The Supreme Court has admonished that, in court review of orders of Boards and Commissions, the public interest looms large. See Federal Communications Comm. v. Sanders Bros. Radio Station, 309 U.S. 470, 475, 60 S.Ct. 693, 84 L.Ed. 869, 1037; Scripps-Howard Radio v. Federal Communications Comm., 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229; Federal Communications Comm. v. N. B.C., 319 U.S. 239, 247, 63 S.Ct. 1035, 87 L.Ed. 1374; Ashbacker Radio Corp. v. Federal Communications Comm., 326 U. S. 327, 66 S.Ct. 148, 90 L.Ed. 108. See also W. R. Grace & Co. v. Civil Aeronautics Board, 2 Cir., 154 F.2d 271, 286; Associated Industries v. Ickes, 2 Cir., 134 F.2d 694.

25. In his initial report, the trial examiner pointed out "certain possible violations of law" including one instance when, "at the request of the Automobile Manufacturers Association, the effective date of the contract period in the eastbound trade was postponed for the Association's members from November 1 to December 31, 1948, and the members were to get the lower contract rates during that period even though they had not signed contracts, a possible unwarranted discrimination against all other shippers." He made no recommendation with respect to this occurrence, nor did the Board, as he suggested, "see fit to investigate it," or even discuss it.

26. Fed.Rules Civ.Proc. rule 54(c), 28 U.S. C.A.; Truth Seeker Co. v. Durning, 2 Cir., 147 F.2d 54, 56; Matarese v. Moore McCormack Lines, 2 Cir., 158 F.2d 631, 633; Gins v. Mauser Plumbing Supply Co., 2 Cir., 148 F.2d 974, 976.

Agriculture, an intervenor in the Board's proceeding, is itself a shipper, and spoke for many other shippers of agricultural commodities. The Agricultural Marketing Act of 1946, 7 U.S.C.A. § 1622(j), authorizes the Secretary of Agriculture "To assist in improving transportation services and facilities and in obtaining equitable and reasonable transportation rates and services and adequate transportation facilities for agricultural products and farm supplies by making complaint or petition to * * * the Maritime Commission * * * with respect to rates, charges, tariffs, practices, and services * * *." An expert of the Department of Agriculture gave testimony before the examiner showing the movement of 1,027,253 tons of a wide range of agricultural commodities in the trade here involved, from July 1, 1947, to June 30, 1948; and that, for the shipments on which the ocean rates on the commodities were named in cents per one hundred pounds, freight charges of $5,323,778.50, based on the Conferences' present rates or proposed exclusive patronage contract rates would be assessed as against $6,406,671.50, based on their proposed higher noncontract rates, or a difference of $1,082,893. This tonnage represents approximately 10 percent of the total products of agriculture exported annually.[27]

9. It has been argued that, since the dual-rate provisions authorize an arbitrary spread and are thus unjustly discriminatory, they also fall foul of the third subdivision of Sec. 812, prohibiting retaliation by a carrier because a shipper has "patronized any other carrier". But, for reasons previously canvassed, we think it unnecessary to decide that issue.

10. To summarize: The conference carriers, acting pursuant to the dual-rate provisions, proposed to put into effect contract and noncontract rates with a spread between the two, which spread the Board found to be arbitrary. We decide that the dual-rate provisions, since they permit an arbitrary spread, are invalid. Our order will therefore provide that the Board's order be set aside, and that the defendants be enjoined from acting pursuant to the dual-rate provisions.

The motions to dismiss are denied. A final injunction will issue.

This opinion is hereby substituted for this court's earlier opinion, dated January 25, 1951, which is hereby recalled and vacated.

## Appendix by Judge FRANK

The briefs and oral arguments were devoted principally to contentions concerning the meaning and applicability of 46 U.S. C.A. § 812(3),[28] but the court has reached its decision without reference to that subsection.

I deem it desirable, however, to set forth, in this appendix, the arguments, pro and con, as to that subsection, which were advanced by the parties before this court or which occurred to any members of this court, but *without expressing an opinion as to the cogency of those arguments.* See W. R. Grace Co. v. Civil Aeronautics Board, 2 Cir., 154 F.2d 271, 282–285, for a previous use of such an appendix. My colleagues, Judges RYAN and KAUFMAN, regard such an appendix as superfluous and undesirable. I therefore take the sole responsibility for it.

1. The Board argues that Sec. 812(3) must be read in the light of the paramount purpose of Sec. 814. The Board maintains that Sec. 814 authorizes carriers to enter into a conference agreement (a) which obliterates competition in rates among those carriers who become parties to the agreement and (b) which also contains provisions having the effect or tend-

---

27. The Department of Agriculture owns or controls great quantities of farm products, substantial portions of which have been and will continue to be exported through our North Atlantic ports to Belgium, The Netherlands and Germany. This direct interest of the Secretary has been especially vital in recent years because of the far-flung rehabilitation pro-

grams of the Federal Government under the Economic Cooperation Act, 22 U.S. C.A. § 1501 et seq., and the Military Government Relief in Occupied Areas. The Department is one of the largest shippers in foreign commerce.

28. For convenience, the subdivisions of Sec. 812 are cited as (1), (2), (3) and (4).

894

ency of destroying outside competition, i. e., competition between (1) the conference carriers as a group and (2) independent carriers, by forcing the independents either to join the conference or (sooner or later) to go out of business. In other words, Congress in Sec. 814 authorized combinations which can coerce all carriers (in any given trade) into accepting noncompetitive rates.[29]

In support of this interpretation, there is cited the language of Sec. 814 that carriers' agreements may provide for "destroying competition," and exempting those making such agreements from the anti-trust laws. It is then argued that an interpretation of Sec. 812 which would deny a conference the use of any devices whatever that destroy rate competition by independent carriers would nullify the intent of Sec. 814. Accordingly, as exclusive patronage contracts with shippers help to carry out that intent, Sec. 812(3) must be construed as not forbidding a conference to use such contracts.

2. The following answers to these arguments have been urged:

Repeals by implication of statutes—especially of the anti-trust laws—are not favored. See U. S. v. Borden Co., 308 U.S. 188, 198–199, 60 S.Ct. 182, 188, 84 L.Ed. 181.[30] The purpose of Sec. 814 was merely to exempt from the anti-trust laws agreements destroying, or substantially reducing, competition among those carriers who choose to join a conference. The first three subdivisions of Sec. 812 were intended (inter alia) to prohibit the use of all methods which would coerce an independent carrier, under threat of financial ruin, to become a member of a conference, thereby destroying rate competition between (1) independents and (2) the conference, to the grave injury of American shippers. This appears from the following:

Section 812(1) forbids "deferred rebates"; Sec. 812(2) forbids "fighting ships" to be used "for the purpose of excluding, preventing, or reducing competition by driving another carrier out of said trade"; Sec. 812(3) forbids any carrier to "retaliate" against any shipper either "by refusing, or threatening to refuse, space accommodations when such are available, or resort to other discriminating or unfair methods, because such shipper has patronized any other carrier * * *." Since the admitted tendency or effect of exclusive patronage contracts is fully as deadly as deferred rebates or fighting ships in wiping out competition between a conference and independents, Congress could not have intended to authorize a conference to use such contracts. The Board's interpretation of Sec. 812(3) would poke a wide hole in the dike erected by Congress against the creation of cartels free of outside competition. That interpretation would work a repeal, by mere implication, of the anti-trust laws, far beyond the express and limited repeal contained in Sec. 814.

Competition is cherished by the common law (and safeguarded by the anti-trust laws) in large part for the purpose of protecting consumers from unreasonably high prices or rates likely to result from monopoly or unreasonable restraint of trade. Therefore, whenever any of our governments has, by statute, insulated anyone from all competition in the same industry— as, for example, by a grant of an exclusive franchise—it has coupled the grant with the establishment—as a substitute for competition as a price-regulator—of a governmental agency empowered to fix reasonable maximum prices or rates. A legally sanctioned complete monopoly, minus such regulation, is virtually unprecedented.[31]

This traditional policy of rate regulation was fully recognized by the House Committee which in 1914, in the so-called Alexander Report,[32] made recommendations

29. See footnote 13, quoting from the Board's brief.

30. There the Court, rejecting a contention that a part of the anti-trust laws had been repealed by implication, said: "We cannot believe that Congress intended to create 'so great a breach in historic remedies and sanctions' ".

31. Patents, copyrights and trade-names are unusual and exceptional.

32. H. R. Doc. 805, 63d Cong., 2d Sess.

that led to the Shipping Act of 1916. That Report (pp. 420–421) recommended that the Interstate Commerce Commission be authorized to investigate the rates of all carriers, including those in foreign commerce, and to order their "rates changed if convinced that the rate under consideration is unreasonably high." The Report explained this recommendation by saying that "the Committee feels that in the absence of governmental control steamship combinations may in many instances have it within their power to arbitrarily raise rates to an unreasonable degree both as regards the general level and in the case of particular commodities * * *. (The) purpose of the law should be to protect the shipper against any unreasonably high rate wich the combination lines may have within their power, by virtue of their agreements and conference arrangements, arbitrarily to impose in the absence of government supervision and control." Congress partly accepted this recommendation, in Sec. 817, by there giving the Shipping Board (now the Federal Maritime Board) the express power to order just and reasonable maximum rates with respect to interstate water-carriers. But Congress omitted any such provision as to carriers in foreign commerce; as to such carriers, there is only the statutory power to forbid discrimination in rates.

Congress could not have intended to authorize such cartels, engaged in foreign commerce, as the Board here has attempted to approve. For the evidence shows that the conference agreements here involved provide that the rates named in the agreements cannot be changed—up or down— without the consent of every single member of the conferences; and a considerable majority of the members are foreign-owned carriers. If the exclusive patronage provisions were valid, and if they effectively achieved their purpose of putting out of business all carriers who refuse to join the conferences, then, with no governmental agency having power to impose maximum rates, American shippers would be entirely at the mercy of foreign-owned carriers, which could maintain rates no matter how unreasonably high.

Sections 812(3) and 814, it is said, must be read against this background. Section 814 provides that the Board is not to approve a conference agreement "in violation of this Act," and, of course, Sec. 812(3) is part of the Act. Stress is laid upon the fact that the word "discriminating" in Sec. 812(3) is unqualified by any adjective, and that this is in striking contrast with (a) Sec. 812(4), which speaks of "any unfair or unjustly discriminatory contract", (b) Sec. 814 which uses the words "unjustly discriminatory," (c) Sec. 815 which contains the phrase "undue or unreasonable preference or advantage * * * or * * prejudice or disadvantage", and (d) Sec. 816 where "discriminatory" is preceded by "unjustly". Consequently, Sec. 812(3) forbids any carrier to resort to any discrimination whatever—whether or not "unjust" or "undue" or "unreasonable"—as against a shipper for patronizing another carrier. Wherefore, exclusive patronage contracts are unlawful per se.

See Baltimore & Ohio R. Co. v. United States, DC., 22 F.Supp. 533, 538, where Judge Learned Hand said: "Subdivision 1, as amended, 49 U.S.C.A. § 3(1), generally forbids a carrier to discriminate unduly or unreasonably in any way between one person, 'locality, port, port district, gateway, transit point' and another. It does not, and could not, impose a peremptory prohibition in such cases; the discrimination must be 'undue or unreasonable'; discriminations are not per se unlawful, their occasion must be examined. That is not true of discriminations under subdivision three, which *is* peremptory, and admits no excuses; carriers must not discriminate in rates between connecting lines." [33] See also Hocking

---

33. The court was interpreting 49 U.S.C.A. § 3 which read as follows:
"(1) It shall be unlawful for any common carrier subject to the provisions of this Act to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, * * * or any particular description of traffic * * * or to subject any particular person, company, firm,

Valley R. Co. v. U. S., 6 Cir., 210 F. 735, 745; Louisville & N. R. Co. v. Mottley, 219 U.S. 467, 478, 31 S.Ct. 265, 55 L.Ed. 297.

If the Shipping Act were given the Board's interpretation, it would probably be unconstitutional. For then it would confer upon a conference, a private cartel, the power to exclude an independent carrier from trade unless the independent joins the conference and accepts its terms; this would be the equivalent of granting a private cartel the power to issue certificates of convenience and necessity, with no statutory criteria to guide their issuance. The statute so construed would, at least, verge on unconstitutionality. A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 537, 55 S.Ct. 837, 79 L.Ed. 1570; cf. Fashion Organizators' Guild of America v. Federal Trade Comm., 312 U.S. 457, 465, 61 S.Ct. 703, 85 L.Ed. 949. Such an interpretation should, if possible, be avoided.

3. To these arguments, the Board replies thus:

(a) The Board has power to prescribe maximum reasonable rates for conferences of carriers engaged in foreign commerce. For, under Sec. 814, the Board may disapprove, cancel or modify any conference agreement if the Board finds the agreement "to operate to the detriment of the commerce of the United States." The Board's predecessors—once in 1935 and twice in 1939—have stated, in opinions, that this language confers power to withdraw approval of conference agreements among carriers engaged in foreign commerce, upon a showing that a conference rate is unreasonably high, since such a rate is detrimental to the commerce of the United States.[34]

(b) If Sec. 812(3) applies at all to conference agreements, the word "discriminating" in that section must be read as "unjustly discriminating," in order to harmonize it with Sec. 814.

corporation, association, locality, port, port district, gateway, transit point, * * * or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever".

"(2) No carrier by railroad subject to the provisions of this Act shall deliver or relinquish possession at destination of any freight transported by it until all tariff rates and charges thereon have been paid, except under such rules and regulations as the commission may from time to time prescribe to govern the settlement of all such rates and charges and to prevent unjust discrimination: Provided, That the provisions of this paragraph shall not be construed to prohibit any carrier from extending credit in connection with rates and charges on freight transported for the United States * * * for any State or Territory or political subdivision thereof, or for the District of Columbia. * * *"

"(3) All carriers, engaged in the transportation of passengers or property, subject to the provisions of this chapter, shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers or property to and from their several lines, and those connecting therewith, and shall not discrim-

inate in their rates, fares, and charges between such connecting lines, or unduly prejudice any such connecting line in the distribution of traffic that is not specifically routed by the shipper. * * *"

Referring to the last clause of 49 U.S. C.A. § 3(3) which read "or unduly prejudice any such connecting line in the distribution of traffic that is not specifically routed by the shipper", the court said: "The discrimination here in question was not really between carriers, but between localities. Of course it is literally true that there cannot be a discrimination between localities without an incidental discrimination between connecting carriers where the localities can only be reached by connecting lines; but for that very reason we should avoid any redundancy. There is some confirmation of this in the last clause of subdivision three, because, although the adverb, 'unduly,' is there introduced, the prohibition appeared to have in mind alternative routes between the same termini. That is what we think this part of subdivision three covers; no general inquiry is necessary beyond that of the two alternative routes. We do not believe that the problem of comparative rates between two localities can be so simplified."

34. See Edmund Weil v. Italian Line "Italia," 1 U.S.S.B. 395 (1935); In the Matter of Rates, Charges, Rules, Regulations, and Practices of the Common Carriers

(c) But Sec. 812(3) is inapplicable to agreements under Sec. 814. For Sec. 814 authorizes agreements "giving * * * special rates". Moreover, while Sec. 812 (1) forbids "deferred rebates," including those by a "combination," and Sec. 812(2) prohibits the use of a "fighting ship either separately or in conjunction with any other carrier," Sec. 812(3) does not similarly refer to joint action.

(d) In any event, the word "retaliate" in Sec. 812(3) means solely conduct that penalizes a shipper for past conduct in patronizing another carrier. The word must be read in the light of Menacho v. Ward, C.C., 1886, 27 F. 529, which held illegal increased rates to shippers because they had previously shipped by a competing carrier. Section 812(3) is a codification of the ruling in that case. Moreover, the non-contract rate here is not a retaliation, since it is charged a shipper who does not sign a contract, regardless of whether or not he patronizes an independent carrier.

(e) Although the Alexander Report recognized the then prevailing use of "deferred rebates" and of "fighting ships", as well as of exclusive patronage contracts, nevertheless the Report recommended the prohibition of the first two practices but did not recommend prohibition of such contracts. Congress adopted the Board's recommendations. Therefore, Sec. 812(3) was not intended to forbid such contracts. In a foot-note to Swayne & Hoyt Ltd. v. United States, 300 U.S. 297, 307, 57 S.Ct. 478, 81 L.Ed. 659, the Court referred to the Alexander Report as recognizing that conference agreements providing for such contracts might, in some circumstances, be valid.[35]

(f) The dual-rate system is not the equivalent of giving the conferences power to issue certificates of convenience and necessity. There is, said the Board in its opinion here, " * * * no evidence that the dual-rate system * * * will * * * effectively cause the exclusion of an independent carrier from any trade route on which he wishes to operate."

4. The following are suggested answers to the Board's contention summarized in point 3:

(a) The words "detriment of the commerce of the United States" in Sec. 814 are far too vague to empower the Board to establish reasonable maximum rates for foreign commerce conferences, since those words are in significant contrast with the very specific provision, as to maximum rates of interstate carriers in Sec. 817, which was enacted at the same time as Sec. 814.

The statements, in the cited cases, by the Board's predecessors, that Sec. 814 confers powers to fix foreign commerce conference maximum rates, were but dicta,

Parties to the Pacific Coast River Plate Brazil Conference Agreement, 2 U.S.M.C. 28 (1939); Pacific Forest Industries v. Blue Star Line, Ltd., 2 U.S.M.C. 54 (1939).

The Board's predecessors have held that 46 U.S.C.A. § 817 is inapplicable to a foreign commerce conference. See Boston Wool Trade Ass'n v. General Steamship Co., 1 U.S.S.B. 49, 51 (1923); cf. Seas Shipping Co. v. American-South African Lines, 1 U.S.S.B. 568, 579 (1936).

35. That footnote reads: "The report of the House Committee on Merchant Marine & Fisheries, H.R.Doc. 805, 63d Cong., 2d Sess. (1914), recommended the prohibition of deferred rebates, adopted in Sec. 14 of the Shipping Act, because it operated to tie shippers to a group of lines for successive periods, and because the system 'is unnecessary to secure ex-cellence and regularity of service, a considerable number of conferences being operated today without this feature.' See, e.g. pp. 103–105, 200. The Committee recognized that the exclusive contract system does not necessarily tie up the shipper as completely as 'deferred rebates,' since it does not place him in 'continual dependence' on the carrier by forcing his exclusive patronage for one contract period under threats of forfeit of differentials accumulated during a previous contract period. Accordingly the Committee did not condemn the contract system completely. Cf. W.T. Rawleigh Co. v. Stoomvaart, 1 U.S.S.B. 285. The policy of the statute may properly be applied where, as in the circumstances of this case, the contract system must be taken as actually operating to effect a monopoly. Cf. Eden Mining Co. v. Bluefields Fruit & S. S. Co., 1 U.S.S.B. 41."

since in those cases the Board did not exercise that power. Nor, in the thirty-four years (1916–1950) since the statute was enacted, has the Board ever attempted to fix such maximum rates.[36]

Counsel for the conference carriers said, in oral argument, that it would never be feasible for the Board to disapprove of foreign commerce conference agreements, when tendered to the Board for approval, on account of unreasonably high rates, because a Board investigation, conducted at that time, into the reasonableness of such rates would be fruitless, and would preclude approval, as conditions affecting rates in foreign commerce fluctuate rapidly. He intimated that the Board could subsequently modify or abrogate such a conference agreement, previously approved, because of unreasonably high rates. But he did not explain why, since conditions would then also be fluctuating, it would then be more feasible for the Board to investigate and fix reasonable maximum rates.

A recent Report by a Senate Sub-Committee[37] states: "Rates in the foreign trade cannot be subject to the direct control of the Government. They are set through the medium of conference agreements between the American and foreign operators in each particular service;" and adds that "discipline in the matter of rates" in foreign commerce "was nearly impossible by our government" and that only "conference discipline"—i. e., concurrence by members of the conferences—can keep rates reasonable. There is, then, no efficacious governmental power to compel reasonable rates in the case of foreign-trade conference carriers.

(b) Section 812(3) does apply to joint action, since Sec. 812 begins with a clause relating to what a carrier does "directly or indirectly". In Pacific Forest Industries v. Blue Star Line, Ltd., 2 U.S.M.C. 54, 57, the Maritime Commission said: "There is

testimony to the effect that the conference threatened to deny complainant space unless it agreed to the increased rates. This is denied by conference witnesses. Such retaliation would be a misdemeanor under the act for which a severe penalty is provided." Thus the Board's predecessor recognized that Sec. 812(3) applies to a conference.

(c) The authorization in Sec. 814 of provisions for "special rates" does not sanction such rates if used to penalize a shipper for patronizing another carrier, for that practice is explicitly made unlawful in Sec. 812(3).

(d) "Retaliate" in Sec. 812(3) does not relate exclusively to conduct penalizing past acts of a shipper: The lex talionis served as a warning of the consequences of future misdeeds. "Retaliatory statutes" look to the future.[38] So, too, does Sec. 812(3) in the phrase "threatening to refuse". There is no basis for the assertion that Sec. 812 (3) was intended merely to "codify" Menacho v. Ward, C.C., 27 F. 529.[39]

Answering the Board's argument that there is here no retaliation since the non-contract rate is charged a shipper who does not sign a contract, regardless of whether or not he patronized an independent carrier, it is noted that the higher rate is charged a shipper who does sign a contract and who then patronizes an independent: in such a situation the higher rate is exacted for the shipper's conduct which is past conduct at the time of such exaction.

(e) The Alexander Report did not approve exclusive patronage contracts. Referring to "deferred rebate systems" as "objectionable," it said (p. 307): "By deferring the payment of the rebate until three or six months following the period to which the rebate applies, ship-owners effectively tie the merchants to a group of lines for successive periods. In this connection *it*

---

36. Counsel for the Board, in a letter to this court, said that "there are no decisions of the Board or its predecessors which imposed maximum rates on conference carriers engaged in foreign commerce."

37. Senate Report 2494, 81st Cong., 2d Sess. pp. 84–85.

38. See 14A C.J. 1268–1270; 20 C.J.S., Corporations, § 1826, Pages 44–45.

39. See footnote 22 as to the inconsistent position of the Board and its predecessors concerning the significance of Menacho v. Ward.

*is argued* [40] that the ordinary contract system does not place the shipper in the position of continual dependence that results from the deferred rebate system." More important, Congress significantly deviated from the Report's recommendation. The Report (p. 421) recommended that "all carriers should be prohibited from retaliating against any shipper by refusing space accommodations when such are available, or by resorting to other unfair methods of discrimination, because such shipper has patronized an independent line, or has filed a complaint charging unfair treatment, or for any other reason." This recommendation was before the Committees which, in the next session, brought out (July 18, 1916) the Bill which became the 1916 Act. See 64th Cong. 1st Sess., Sen.Report No. 689, pp. 10–11. But the Bill and the Act importantly departed from the recommendation of the Alexander Report: Sec. 812(3) substituted, for the recommended words "other unfair methods of discrimination," the words "other discriminating or unfair methods". And this change was concomitant with another deviation from the Alexander Report by which Congress inserted "unfair or unjustly discriminatory" in Sec. 812(4)—thus showing that it knowingly and deliberately deleted "unfair" in Sec. 812(3).

The footnote in Swayne & Hoyt, Ltd. v. United States, 300 U.S. 297, 57 S.Ct. 478, 482, 81 L.Ed. 659, is at best, dictum, for the Court there affirmed an administrative decision which had disapproved an exclusive patronage provision as unduly discriminatory under Secs. 815 and 816, so that Sec. 812(3) was not before the Court. Moreover, the body of the court's opinion, which said that the operation of an exclusive contract system "does not differ substantially from that of 'deferred rebates'", is somewhat inconsistent with the footnote. In addition, although the Court in the footnote referred to the Alexander Report, it

did not have its attention directed to the fact that Congress had importantly deviated from the Report's recommendations.

(f) It does not answer the certificate-of-convenience argument to say that the dual-rate provisions will not exclude an independent carrier from any trade route on which he wishes to operate. For as the Board states in its brief (see footnote 13 supra), such exclusion will result if the dual-rate provisions work successfully.

(g) The Attorney General advanced the following contention: The exemption in Sec. 814 from the anti-trust laws is specifically restricted to an "agreement" by a carrier "with another such carrier or other person subject to this chapter"; a shipper, under Sec. 801, is not an "other person subject to" this Chapter; consequently the exemption does not include a contract between a conference and a shipper. In support of this argument, it is noted that the Alexander Report recommended that Commission approval be required not only of agreements between carriers but also of carriers' contracts with shippers, but that, in enacting Sec. 814, the recommendation as to contracts with shippers was omitted.

5. It is suggested that an exclusive patronage provision in a conference agreement will not violate Sec. 812(3) if that provision has a clearly legitimate economic purpose and effect other than that of either penalizing shippers for patronizing nonconference carriers or creating a cartel free of competition from such independent carriers. This suggestion has these variants: (a) Such a provision is lawful if, and only if, the Board, on the basis of substantial evidence, finds that the "spread" between the contract and noncontract rates is reasonable. (b) Such a provision is lawful if, and only if, in addition to (a), the Board, on the basis of substantial evidence, finds that the noncontract rates are not unreasonably high.[41]

---

40. Emphasis added.

41. Cf. the discussion in footnote 16 of Lough v. Outerbridge, 143 N.Y. 271, 38 N.E. 292, 25 L.R.A. 674.

The examiner in this case stated that there was no evidence as to the reasonableness of the two types of rates. Nor

did the Board find the contract rates reasonable. As stated in footnote 16, plaintiff urges that the contract rates are unreasonably high, since they are the rates established during World War II to cover the then prevailing and unusually high costs.

I repeat that I express no opinion as to the cogency of any of the foregoing arguments.