239 F.2d 933
 ISBRANDTSEN COMPANY, Inc., Petitioner,
v.
UNITED STATES of America and Federal Maritime Board, Respondents,
The Secretary of Agriculture, Intervenor,
Japan-Atlantic and Gulf Freight Conference, et al., Intervenors.
 No. 13027.
 United States Court of Appeals District of Columbia Circuit.
 Argued May 16, 1956.
 Decided November 9, 1956.
 Writ of Certiorari Granted March 25, 1957.
 
 See 77 S.Ct. 664.
 Mr. John J. O'Connor, Washington, D. C., for petitioner.
 
 
 1
 Mr. Daniel M. Friedman, Atty., Dept. of Justice, with whom Messrs. Neil Brooks, Asst. Gen. Counsel, United States Dept. of Agriculture, and Donald A. Campbell, Atty., U. S. Dept. of Agriculture, were on the brief, for respondent United States of America, and intervenor The Secretary of Agriculture.
 
 
 2
 Mr. Charles H. Weston, Atty., Dept. of Justice, also entered an appearance for respondent United States of America.
 
 
 3
 Mr. Edward D. Ransom, Gen. Counsel, Federal Maritime Board, with whom Messrs. James L. Pimper, Asst. Gen. Counsel, Federal Maritime Board, and Edward Schmeltzer, Atty., Federal Maritime Board, were on the brief, for respondent Federal Maritime Board.
 
 
 4
 Mr. Elkan Turk, New York City, with whom Messrs. James M. Landis, White Plains, N. Y., and Elkan Turk, Jr., Brooklyn, N. Y., were on the brief, for intervenors Japan-Atlantic and Gulf Freight Conference and others.
 
 
 5
 Messrs. Abba P. Schwartz, Seymour J. Rubin and Wallace M. Cohen, Washington, D. C., also entered appearances for intervenors Japan-Atlantic and Gulf Freight Conference and others.
 
 
 6
 Before PRETTYMAN, FAHY and WASHINGTON, Circuit Judges.
 
 
 7
 FAHY, Circuit Judge.
 
 
 8
 Pursuant to 64 Stat. 1130 (1950), 5 U.S.C. § 1034 (1952), 5 U.S.C.A. § 1034, Isbrandtsen Company, Inc., petitions as a party aggrieved for review of orders of the Federal Maritime Board which are described as a Report served December 14, 1955, and orders served December 21, 1955, and January 11, 1956. The respondents are the Board and the United States, the latter being a statutory respondent under section 1034, supra. The United States, however, represented by the Attorney General, has joined Isbrandtsen in attacking the validity of the orders under review. The intervenors are the Secretary of Agriculture, supporting Isbrandtsen, and the Japan-Atlantic and Gulf Freight Conference, defending the orders of the Board.
 
 
 9
 The Conference is a voluntary association of 17 steamship lines operating between Japan, Korea, and Okinawa, and the Gulf and Atlantic Coasts of North America. Five of the members are American, eight are Japanese, and four are of other nations. The primary purpose of the Conference is to establish and maintain agreed rates among the members. The basic agreement under which the Conference operates was approved by a predecessor agency of the Federal Maritime Board in 1934 under section 15 of the Shipping Act of 1916, 39 Stat. 733, as amended, 46 U.S.C. § 814 (1952), 46 U.S.C.A. § 814.[1]
 
 
 10
 Isbrandtsen is not a member of the Conference, although membership is open to any common carrier regularly operating or intending regularly to operate in the trade. Since shortly after World War II Isbrandtsen has been the sole non-Conference line which has maintained a berth service in the Japan-Atlantic trade. This trade is overtonnaged and consequently the vessels of both Isbrandtsen and the Conference have had a substantial amount of free and usable space after completion of loading in Japan. Between 1947 and March 12, 1953, Isbrandtsen maintained its rates on most commodities an average of 10 per cent below the rates established by Conference members under their agreement. Isbrandtsen's share of the business during this period was substantial, and its average carryings per sailing were much higher than were the average carryings of the Conference lines. In order to meet this competition the Conference members voted to adopt the exclusive patronage contract/non-contract dual-rate system described below, but when the Conference was restrained by this court from putting this system into effect prior to its approval by the Board the Conference, on March 12, 1953, opened the rates on ten major commodities. This permitted the member lines to set their own rates and to compete effectively with Isbrandtsen.
 
 
 11
 After March 12, 1953, rates dropped sharply, even to noncompensatory levels with respect to some commodities. In May, 1953, Isbrandtsen established minimum rates below which it would not go. This adversely affected its competitive position, so that since that date Isbrandtsen has carried little cargo in the trade.
 
 
 12
 On December 24, 1952, before rates had been opened by the Conference, it had filed with the Board, pursuant to the latter's General Order 76,[2] a statement advising the Board of the Conference's intention to institute in 30 days an exclusive patronage contract/non-contract dual-rate system in the Japan-Atlantic trade, hereinafter referred to as the dual-rate system. Under the proposed system shippers who declined to sign an exclusive patronage contract with the Conference would be charged rates 9½ per cent higher for the same transportation service than the rates charged shippers who enter into such contracts. Breach of the exclusive patronage contracts would be sanctioned by means of a liquidated damage clause under which a shipper who breaches the contract by shipping with a non-Conference line would be obligated to pay to the Conference 50 per cent of the contract rate on the shipment. The contract would be entered into for an indefinite period, subject to cancellation by either party on three months notice.
 
 
 13
 Protests against the proposed dual-rate system were filed by Isbrandtsen and the Department of Justice, who requested the Board to prohibit the Conference from implementing the system until after a hearing had been held. The Board granted the request for a hearing, but declined to suspend operation of the dual-rate system, stating that the system appeared to be in compliance with the Shipping Act.
 
 
 14
 On petition for review in this court, we held that section 15 of the Act, note 1, supra, required the Board to approve the dual-rate system before it could legally be initiated. Isbrandtsen Co. v. United States, 93 U.S.App.D.C. 293, 211 F.2d 51, certiorari denied 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124. Consequently we set aside the action of the Board allowing the system to go into effect without such approval, and enjoined the Conference from acting under the system until it was approved by the Board. Thereafter the Board's hearings resulted in its approval of the dual-rate system in the orders which are now here for review.
 
 
 15
 If the arrangements in question are such as the statute authorizes the carriers to make or the Board to approve, they are exempt from the inhibitions of the antitrust laws under section 15, note 1 supra. In providing for such exemption, however, the statute also places definite limits. For example sections 16 and 17 of the Act, 46 U.S.C.A. §§ 815, 816 provide, "it shall be unlawful" for any common carrier by water, alone or in conjunction with another, to
 
 
 16
 "make or give any undue * * * preference or advantage to any particular person,"
 
 
 17
 or to
 
 
 18
 "demand, charge, or collect any rate, fare, or charge which is unjustly discriminatory between shippers * * *."
 
 
 19
 The Board strongly urges that the dual-rate system cannot be said to give any "undue preference or advantage" or to constitute a demand, charge, rate or fare which is "unjustly" discriminatory. It says that because of competitive conditions in the trade the preference is not "undue" or the discrimination "unjust". In explaining these conditions the Board points to the differences in the operating costs of carriers of different nationalities, to the need for stability of rates and services, to freedom of any steamship company to enter this trade in contrast to the requirements of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq. that there be a finding of public convenience and necessity, to the relationship between costs of operating and the quantity of cargo carried, and to other factors, all of which, in the view of the Board, are shown by the record and support the Board's findings that the inauguration of the dual-rate system is a necessary competitive measure to offset the harmful effect of non-Conference competition in an overtonnaged trade subject to the injurious practice of undercutting of Conference rates. The Board points furthermore to its finding that the dual-rate system will decrease the possibility of continued rate wars with their disastrous consequences to American-flag lines, consequences repugnant to the purposes of the Act to encourage the development and creation of a naval auxiliary and reserve, and a merchant marine able to meet the requirements of the commerce of the United States with foreign countries.
 
 
 20
 We might agree with the Board that the objectives it seeks in approving the dual-rate system are consistent with the objectives of the statute; but these can be furthered only by means permitted by the statute. It is here that we find an insuperable barrier. Section 14, Third, of the Act, 46 U.S.C.A. § 812, subd. 3, provides that no common carrier by water shall
 
 
 21
 "Retaliate against any shipper by refusing, or threatening to refuse, space accommodations when such are available, or resort to other discriminating or unfair methods, because such shipper has patronized any other carrier * * * or for any other reason."
 
 
 22
 As we have seen, shippers who decline to sign an exclusive patronage contract with the Conference would be charged for the same transportation service rates 9½ per cent higher than those charged shippers who enter into such contracts, and breach of contract by one who does sign would entail liquidated damages of 50 per cent of the contract rate. While in terms the 9½ per cent higher rate is for failure to enter into an exclusive patronage contract rather than for actually shipping via a non-Conference carrier, in reality the higher rate is for the latter, as are the liquidated damages. Each of these aspects of the dual-rate system is hinged to a shipper giving patronage to another carrier. This is explicit in the provision for liquidated damages, which is part and parcel of the dual-rate system and gives color to the whole; and it is implicit in the difference between the contract rate and the higher non-contract rate. When the latter is charged a shipper who has not entered into an exclusive patronage contract the substance of the matter is that a higher rate is charged because he ships by other than Conference carriers. The industry is concerned with the business of shipping, to which the making of contracts is but an incident. Both provisions, therefore, come within a fair meaning of retaliation. Furthermore, even though the shipper has not patronized another the higher rate constitutes retaliation because it is charged for failure to contract with the Conference. Section 14, Third, applies not only to retaliation for shipping by another carrier but for "any other reason," which would include failure to enter into the exclusive contract arrangement. True it is, as the Board urges with much persuasion, the dual-rate system may be very potent in promoting stability and regularity of service and may be warranted by competitive considerations; but when at the same time the system constitutes retaliation and is also discriminatory it runs into the barrier of section 14, Third, however desirable it otherwise might be. That provision prohibits not only retaliation by a refusal, or threat of refusal, of available space accommodations but also by "resort to other discriminating" methods. In the circumstances stated, the charge of a higher rate for the same service and facilities, or the imposition of the liquidated damages, is prima facie discriminatory, Swayne & Hoyt, Ltd. v. United States, 300 U.S. 297, 57 S.Ct. 478, 482, 81 L.Ed. 659, and for the reasons we have outlined we think that it is also a method of retaliation. This is the thrust of these provisions under a fair reading of the language adopted by Congress. And since these provisions are unlawful the system containing them cannot validly be approved by the Board.
 
 
 23
 We cannot accept the argument that section 14, Third, must be read, in view of the terms of the Act as a whole, to condemn only retaliation which the Board might on a particular record find "unfair" or "unjustly discriminatory," terms used in other parts of section 14 and in sections 15 and 17. Where the conduct is retaliatory and constitutes discrimination, it is unlawful without more, unless its impact is unsubstantial, a subject we need not consider. Absent retaliation a preference or discriminatory rate is unlawful only if undue, unreasonable, unfair or unjust. Whether or not these characteristics exist depends upon the facts and circumstances of the case as found by the Board; and the courts will not substitute their judgment in this regard for that of the Board. Swayne & Hoyt, Ltd. v. United States, supra. There the court in effect approved an order of the Secretary of Commerce, the predecessor of the Board, which had condemned a higher rate for a shipper who used a carrier other than a member of the Conference. The court said the differential was prima facie discriminatory since the two rates were charged for identical services and facilities, leaving for decision, in the first instance by the Secretary, the question whether the discrimination was "undue" or "unreasonable." The Secretary having concluded that it was, the court, considering the case under section 16, would not disturb his conclusion, which was in part based upon his finding that the operation of the contract system in the circumstances "does not differ substantially from that of `deferred rebates' outlawed in both foreign and coastwise shipping by section 14 of the Shipping Act * * *." Since the dual-rate system here constitutes retaliation it must be condemned without regard to the question of its reasonableness, as are deferred rebates. For while it is not one of the methods specifically condemned by section 14, as are deferred rebates and fighting ships, nevertheless retaliation is specified in subparagraph Third of section 14 as a method which may not be resorted to when discriminatory.
 
 
 24
 We are aware that the dual-rate system has not been held by any judicial decision to be invalid under section 14, Third; that is, without regard to the reasonableness or justness of the discrimination inherent in the system. We have already referred to Swayne & Hoyt, Ltd. v. United States, supra, which, though it upheld the Board in condemning the dual-rate system there involved, did not rest upon section 14, Third. In Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576, the court, adhering to principles previously laid down in United States Navigation Co. v. Cunard Steamship Co., 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408, required the District Court to dismiss a suit of the United States which attacked the dual-rate system as violative of the Sherman Act, 15 U.S.C.A. §§ 1-7, 15 note without the particular system having been passed upon initially by the Board. And in A/S J. Ludwig Mowinckels Rederi v. Isbrandtsen Co., 342 U.S. 950, 72 S.Ct. 623, 96 L.Ed. 706, the court by an equally divided vote affirmed Isbrandtsen v. United States, D.C., 96 F.Supp. 883, which had invalidated the dual-rate system there involved, not under section 14, Third, but because the spread between the two rates was found to be arbitrary. From this situation in the courts the Board contends that the dual-rate system has not been considered invalid per se, otherwise the courts would have disposed of these cases on that ground. This position is an arguable one; but the fact is that the cases do not decide the point. And for the reasons which we have indicated we are of the opinion that additional legislation would be needed to permit the system, in the form here approved by the Board, to obtain the approval of the courts. Congress, after long consideration, lodged very substantial powers in the Board; but we find no language in the statute which, given its fair meaning, permits the Board to grant exemption from the antitrust laws, or to make lawful a discriminatory rate, or the imposition of liquidated damages, for patronizing a competitor, for refusal to enter into an exclusive patronage contract with Conference members, or for not shipping exclusively in accordance with such a contract.
 
 
 25
 We have considered the legislative history, particularly pertinent parts of H.R. Doc. No. 805, 63d Cong., 2d Sess. (1914), known as the Alexander Report. The evils afflicting the industry due to uncontrolled competition on the one hand and unregulated carrier combinations on the other, are analyzed in this basic study preceding the Act. Reference is also made to H.R. Rep. No. 659, 64th Cong., 1st Sess. (1915);[3] H.R. 14337, 64th Cong., 1st Sess. (1915); S. Rep. No. 689, 64th Cong., 1st Sess. (1915).[4] We have found in this history no indication of an explicit intention by Congress to outlaw the dual-rate system, as is found with respect to deferred rebates and fighting ships. Furthermore, it is clear from its history, as from the Act itself, that not all discriminatory practices and preferences are unlawful. On the contrary, the Board is authorized to approve many methods, including the formation of the conferences themselves, which would be unlawful except for the Act and Board action thereunder. But it is significant that when Congress came to the matter of retaliation against a shipper it did not permit this particular type of conduct to be engaged in or to be approved by the Board if it involved any discriminating method.[5]
 
 
 26
 Finally, we have considered the Board's position that the enumeration of deferred rebates and fighting ships as practices absolutely prohibited, in contrast with the failure to include in such enumeration the dual-rate system, indicates that the latter was not to be considered illegal per se. We do not accept this position because to do so would seem to us to give little meaning to the important provision of section 14, Third, that retaliation for any reason is also absolutely prohibited if it constitutes discrimination. We think it clear not only that the liquidated damage provision is discriminatory but that a 9½ per cent differential for exactly the same service and facilities is of like character. Further discussion of the matter appears in Judge Washington's concurring opinion "in which, as in the present opinion, we all concur." Walker v. Popenoe, 1945, 80 U.S.App.D.C. 129, 131, 149 F.2d 511, 513.
 
 
 27
 The orders of the Board will be set aside insofar as they approve the exclusive patronage contract/non-contract rate system.
 
 
 
 Notes:
 
 
 [1]
 Section 15 provides in pertinent part:
 "Every common carrier by water * * shall file immediately with the Federal Maritime Board a true copy, or, if oral, a true and complete memorandum, of every agreement, with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term `agreement' in this section includes understandings, conferences, and other arrangements.
 "The Board may by order disapprove, cancel, or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors or to operate to the detriment of the commerce of the United States, or to be in violation of this chapter, and shall approve all other agreements, modifications, or cancellations.
 * * * * *
 "All agreements, modifications, or cancellations made after the organization of the commission shall be lawful only when and as long as approved by the Board, and before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation.
 "Every agreement, modification, or cancellation lawful under this section shall be excepted from the provisions of sections 1-11 and 15 of Title 15, and amendments and Acts supplementary thereto."
 
 
 [2]
 Section 236.3 of that Order, 17 F.R. 10175, 46 C.F.R. 236.3, provides that steamship freight conferences proposing to establish contract/non-contract rates should file with the Board a statement containing:
 "(a) The amount of the spread or differential * * *.
 "(b) The effective date;
 "(c) The reasons for the use of contract/non-contract rates in the particular trade involved, and the basis for the spread or differential between such rates; and
 "(d) Copies of the form of all contracts pertaining thereto."
 
 
 [3]
 This Report at pp. 30-31 refers to retaliation by refusing space accommodations or "other unfair methods of discrimination."
 
 
 [4]
 In this Report, at p. 5, section 15 of H.R. 15455 is described in part as forbidding "retaliation, etc., against a shipper because such shipper has patronized any other carrier."
 
 
 [5]
 Compare H.R. 17328, 63d Cong., 2d Sess., section 2, Third, with H.R. 15455, 64th Cong., 1st Sess., showing changes which add "unjust" to "discrimination" in certain parts in the Bill, but not in section 2, Third, which corresponded with section 14, Third, of the Act, where discrimination without qualification is prohibited when used as retaliation
 
 
 
 28
 WASHINGTON, Circuit Judge (concurring).
 
 
 29
 I fully concur in Judge Fahy's opinion. However, certain additional observations may be made, with which both my colleagues agree, and which they have asked me to express on behalf of the court.
 
 
 30
 The crucial question on this appeal is of course whether Section 14, Third, of the Shipping Act of 1916[1] proscribes the type of contract here involved.
 
 
 31
 In the first place, it seems clear that in actual practice the contract system is being used to penalize a shipper because he has patronized another carrier, or at least reserved the right to do so. Is this "retaliation," proscribed by the Act? Certainly there seems no reason to limit "retaliation" to the dictionary definitions of "returning like for like" or "evil for evil," which have been selected by the Board. The very example used by the statute, boycotting for use of another carrier, is not "like for like," nor are the boycotting carrier or group of carriers necessarily imbued with ideas of doing evil. But detriment to the independent shipper and the independent carrier plainly results.
 
 
 32
 Are these contracts, then, the sort of "discriminating or unfair methods" that the statute sought to anticipate? That the contract system comes within the literal meaning of this phrase is clear. As the Supreme Court observed in Swayne & Hoyt, Ltd. v. United States, 1937, 300 U.S. 297, 303, 57 S.Ct. 478, 81 L.Ed. 659, a contract system under which different prices are charged for the same transportation of identical cargoes to identical ports under identical circumstances is "prima facie discriminatory."[2] Nevertheless, the Board urges that the literal meaning of the statute should not be followed.
 
 
 33
 The Board's basic contention is this: Since dual rate contracts were considered by Congress in its survey of shipping practices, the conspicuous absence of this device from the list of those specifically barred — deferred rebates, fighting ships, and boycotts — demonstrates an implied congressional endorsement of this device. Were the premise sound, the argument would have some merit. But the fact is that the contracts examined by the Alexander Committee in 1913 were materially different from the contracts before us now. The 1913 contracts were bona fide requirements contracts. The sellers (carriers) undertook a firm obligation to provide space; both parties undertook firm obligations as to the price. And since the price was fixed for the term of the contract (usually 6 months), the price figure in the contract represented a hedge on the part of both parties against fluctuations in rates.[3] In the contracts in suit the carriers' commitment as to space is almost illusory,[4] being a commitment to carry "so far as regular services are available." The price aspect of the contract is in terms subject to increases. Thus, the two principal considerations normally given to a buyer (the shipper) under a requirements contract — guarantee of supply and guarantee of no rate increase — are here lacking.[5] In their stead are two essentially penal provisions — the higher rate and the liquidated damage clause — both imposed to coerce shippers to refrain from using non-Conference carriers.[6] These differences are dispositive of the Board's principal argument. Implied congressional approval of a bona fide requirements contract is no basis for exempting the contracts in this case from the plain meaning of "discriminating or unfair methods." They must therefore be condemned.
 
 
 
 Notes:
 
 
 [1]
 39 Stat. 733, as amended, 46 U.S.C.A. § 812, subd. 3
 
 
 [2]
 It is urged that footnote 3 of the Court's opinion in Swayne & Hoyt is some authority for exempting the contracts in this case from Section 14 Third. There are two answers to this argument. First, the Court was there concerned not with a recommendation of the Alexander Committee but with an argument that had been addressed to the Committee. See H.R.Doc. No. 805, 63rd Cong., 2d Sess. 307 (1914). Second, and more significant, is the fact that the contracts considered in Swayne & Hoyt closely follow the outlines of the contracts reviewed by the Alexander Committee in 1913, which are materially different from the contracts in this case, see text infra. The contracts in Swayne & Hoyt contained a firm price agreement that could not be varied during the term of the contract. See Swayne & Hoyt v. United States, D.C.1936, 18 F.Supp. 25, 26
 
 
 [3]
 For the text of the contracts considered by the Alexander Committee, see Proceedings of the House Committee on the Merchant Marine and Fisheries, 62nd Cong., 2d Sess., Vol. 1, pp. 97, 120, 289 (1913). For the Committee's summary of these contracts, see H.R.Doc. 805, supra at 290-91. In most of these contracts the price term was fixed as against increases, but shippers were entitled to any decreases in the regular tariffs. In other contracts the price stated was binding on both sides. See Marx, International Shipping Cartels 202 (1953)
 
 
 [4]
 See 1 Corbin, Contracts § 16 (1950)
 
 
 [5]
 See, generally, Stockhausen, The Commercial and Anti-Trust Aspects of Term Requirements Contracts, 23 N.Y.U.L.Q. 412, 413 (1948)
 
 
 [6]
 This is not to suggest that the liquidated damage clause would necessarily be unenforceable as a penalty, cf. Pacific Westbound Conference v. Leval & Co. (unreported) (Cir.Ct.Or.1951), cited in Marx, supra at 209, though it might be. See 5 Corbin, Contracts § 1054 (1951). It may be noted that compliance with the contracts used in 1913 was in many instances secured not by deferred rebates, see Proceedings, supra at 99, 204, 278, or by penalty clauses, id. at 96, but by threat of future boycotting, ibid., a device specifically condemned in Section 14, Third. The contracts in this case would substitute for this blunt weapon the more refined techniques of penalty rates and liquidated damage clauses. Thus, instead of a retaliatory device to enforce a bona fide requirements contract, there are now retaliatory contracts, enforced by methods of seemingly equal effectiveness