**ANGLO CANADIAN SHIPPING COMPANY, Ltd., et al., Petitioners,**

v.

**UNITED STATES of America and Federal Maritime Board, Respondents.**

**No. 15241.**

United States Court of Appeals
Ninth Circuit.

Feb. 18, 1959.

406

Graham, James & Rolph, Chalmers G. Graham, Leonard G. James, San Francisco, Cal., for appellant.

Victor R. Hansen, Asst. Atty. Gen., Daniel M. Friedman, Atty., Dept. of Justice, E. Robert Seaver, Gen. Counsel, Robert E. Mitchell, Asst. Gen. Counsel, Edward Aptaker, Chief, Regulation Branch, Leroy F. Fuller, Atty., Federal

Maritime Board, Washington, D. C., for appellee.

Before POPE, HEALY and ORR, Circuit Judges.

POPE, Circuit Judge.

This is a proceeding upon a petition seeking review of an order of the Federal Maritime Board.[1] The order here in question was entered June 29, 1956, in a proceeding entitled Mitsui Steamship Co., Ltd. v. Anglo Canadian Shipping Co., Ltd., et al. The respondents there, who are the petitioners here, are a group of 24 common carrier steamship lines who had formed a voluntary association or conference known as the Pacific Coast European Conference. The member carriers operated in the trade from the Pacific Coast of the United States and Canada to Europe. The Conference was established pursuant to an organic agreement known as "Conference Agreement No. 5200." This organic or basic agreement was initially approved on May 26, 1937, and copies filed with the Board pursuant to § 15 of the Shipping Act (46 U.S.C.A. § 814).

The controversy here presented arises out of a form of agreement between the Conference carriers and certain signatory shippers referred to in the record as the Conference's exclusive patronage contract or shippers' rate agreement. Through the use of this agreement the Conference implements an exclusive patronage contract/non-contract dual rate system whereby a shipper who agrees to make all his shipments in this trade by Conference carriers receives a lower freight rate than shippers who do not sign such an exclusive patronage contract. The agreement covers all export shipments of the shipper to European countries mentioned moving via any Pacific Coast port of the United States or Canada. It provides that all such shipments are required to be tendered to the Conference carriers; and in case of shipment in violation of this provision, the shipper is required to pay the Conference "liquidated damages" calculated in a manner specified in the agreement; and more than one violation in a period of 12 months may result in a cancellation of the contract by the Conference.

Prior to 1953 the Conference had no competition in this trade from outside or independent lines, but in September, 1953, Mitsui, a Japanese common carrier, began hauling merchandise between Pacific coast ports of the United States and ports of the United Kingdom and continental Europe. On October 1, 1954, Mitsui filed a complaint before the Board against the petitioners, as members of the Conference, alleging that the respondents had created and established an exclusive patronage contract/non-contract dual rate system under which signatory shippers agreed to patronize exclusively the vessels of Conference members and who would be charged a rate lower than would similar shippers who refused to sign those contracts and who patronized Mitsui's vessels.

The complaint alleges that consignees and buyers of goods purchased in the United States on an F.O.B. or F.A.S. basis, and who are not signatories to the exclusive patronage contract, desired to designate the vessels on which their goods are to be shipped and to ship by Mitsui's vessels; that the Conference members "by the use of unfair, coercive, discriminatory and illegal practices", are coercing such consignees to ship exclusively on Conference vessels with resultant harm and damage to the complainant Mitsui; that the practices complained of were in violation of §§ 14, 15, 16 and 17 of the Shipping Act.

The respondents joined issue by answer and Public Counsel[2] asked and was

1. The procedure for review is prescribed by Title 5 U.S.C.A. §§ 1031 to 1042, commonly known as the Hobbs Act.

2. Petitioners, questioning the standing of this Public Counsel, assert he was employed, not by the Board, but by the Federal Maritime Administration. We consider this unimportant, since the Board permitted this intervenor, whoever he was, to speak on behalf of the

granted leave to intervene in the proceeding in support of the complaint. Hearing was had before an examiner who found and recommended a decision that the respondents had not coerced foreign buyers and consignees to ship goods purchased by them in the United States exclusively on Conference vessels, and had not thus deprived these buyers and consignees of their right to ship on complainant's vessels, and that the complaint be dismissed.

The Board, after hearing argument on the exceptions to the recommended decision proceeded to make its own findings and report. That report, while reviewing at some length the testimony of witnesses who testified in support of complainant and of respondents, was essentially devoted to a discussion of the terms of the shippers' rate agreement as it applied to shipments in the trade of goods sold on F.O.B., F.A.S., C.I.F. or C. & F., basis.[3]

After an analysis of the agreement and an extended discussion of the rules of law relating to the question when title passes in F.O.B. or F.A.S. transactions, and a discussion of the use of these terms in foreign trade transactions, the Board found that F.O.B. and F.A.S. shipments are shipments of the foreign buyer and not of the signatory seller, (with certain exceptions not here relevant), and hence that F.O.B. and F.A.S. transactions, which are shipments of the buyer, are not covered by the shippers' rate agreement. This, the Board held, was the meaning of the agreement as it was initially approved by the Board.[4]

The Board found that after Mitsui entered the trade, and during 1954, the Conference notified ten signatories to this shippers' rate agreement that the Conference had information indicating shipment of cargoes via Mitsui in violation of that agreement; that not only then but generally the Conference was taking the position that its shippers' rate agreement applied to all shipments regardless of the terms of sale; and that if a foreign buyer insisted that under the terms of an F.O.B. or F.A.S. sale he had the right to direct the routing via a non-conference vessel, the seller must refuse to make the sale.[5]

The Board found it unnecessary to consider whether this Conference interpretation of the shippers' rate agreement was detrimental to commerce of the United States or whether such an interpretation

public. This was a matter within the Board's discretion.

3. F.O.B.—free on board; F.A.S.—free along side; C.I.F.—cost, insurance and freight; C. & F., cost and freight.

4. The record is silent as to when or how the shippers' rate agreement was originally so approved, but the Board's brief refers to "Pacific Coast European Conference Agreement", 3 U.S.M.C. 11, 18 (1948), where the Board's predecessor passed on the agreement.

5. The Board's finding as to the position of the conference with respect to its shippers' rate agreement was stated as follows: "The Conference takes the position that its Shippers' Rate Agreement applies to all shipments, regardless of the terms of sale, and that if a signatory shipper enters into any arrangement with the foreign buyer which permits the foreign buyer to direct cargo to move on a non-conference vessel, the signatory shipper violates the agreement. The Conference chairman stated that if a foreign buyer insisted that he had the right, under the terms of an F.O.B. or F.A.S. sale, to direct the routing via non-conference vessel, the signatory shipper, in order to comply with the terms of the Shippers' Rate Agreement, could not deliver to the non-conference vessel, and that if the Buyer insisted on his right, compliance with the Shippers' Rate Agreement would require the seller to refuse to make the sale. It is the Conference's position that a sale F.O.B. inland plant in the United States, where the foreign buyer or his forwarder handles the inland transportation and ships via non-conference line, would amount to a violation of the Shippers' Rate Agreement by a signatory seller, if the seller knew that the goods would be shipped abroad. The mere fact that an F.O.B. or F.A.S. shipment moved via a non-conference line would amount to an evasion or a subterfuge within the meaning of the Shippers' Rate Agreement."

should be approved or disapproved.[6] It stated that it could not find that the Conference's interpretation had resulted in violation of §§ 14, 16 or 17 of the Act, and that no injury to any exporter had been shown to have resulted from Conference termination of the exporter's right to contract rates because a shipment of the exporter had moved via nonconference vessel under F.O.B. or F.A.S. terms; that there was no evidence of any actual loss by specific discrimination against Mitsui; and that there was no evidence that any foreign consignee had suffered any loss or injury; or that unjust or discriminatory rates had been charged.

Notwithstanding all this, the Board proceeded to find that the Conference's interpretation of the shippers' rate agreement, as above described, was a new Conference interpretation or a modification of an approved agreement which had not been approved by the Board, and since that interpretation had been "effectuated prior to such approval in violation of § 15", the respondents were ordered to cease and desist from effectuating any interpretation of the shippers' rate agreement inconsistent with the Board's interpretation set forth in the report.

The examiner's report was dated October 18, 1955. On December 21, 1955, Mitsui wrote the Board advising that the Conference had adopted a resolution that

Mitsui be admitted to membership in the Conference, effective February 1, 1956, "upon receipt by the Conference office of satisfactory information that Mitsui has withdrawn from pending litigation in which its position is opposed to that of the Conference," and that it withdrew from the litigation before the Board. Mitsui was then advised that it must file an application for withdrawal with proper reasons therefor. Consent so to withdraw was not granted by the Board,[7] which proceeded with its hearing and consideration of the case before it.

Another circumstance which must be understood here is the fact that after the filing of the petition for review in this court, the Court of Appeals for the District of Columbia in Isbrandtsen Co. v. United States, 99 U.S.App.D.C. 312, 239 F.2d 933, held that a substantially similar exclusive patronage contract/noncontract dual rate system was per se unlawful. That decision was affirmed by the Supreme Court on May 19, 1958. Federal Maritime Board v. Isbrandtsen Co., 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed. 2d 926. Later, and on August 12, 1958, Congress enacted Public Law 85–626, 72 Stat. 574, amending the section of the Shipping Act on which the Isbrandtsen decision was based, so as to hold valid any dual rate contract arrangement in use by the members of a Conference on May 19, 1958. The entire Act is set forth in the margin.[8]

---

**6.** The report stated: "We do not here state that we may never approve of a Shippers' Rate Agreement which requires its signatories to ship exclusively via conference vessels all goods sold by such signatories for export in the trade served by the Conference, whether sold on F.O.B., F.A.S., C.I.F. or C. & F. terms."

**7.** On June 29, 1956, after the final order of the Board, a formal motion to terminate the proceeding with respect to Mitsui was filed before the Board but the record fails to show any action on that motion.

**8.** "Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That section 14 of the Shipping

Act, 1916, is amended by inserting at the end thereof the following: 'Provided, That nothing in this section or elsewhere in this Act, shall be construed or applied to forbid or make unlawful any dual rate contract arrangement in use by the members of a conference on May 19, 1958, which conference is organized under an agreement approved under section 15 of this Act by the regulatory body administering this Act, unless and until such regulatory body disapproves, cancels, or modifies such arrangement in accordance with the standards set forth in section 15 of this Act. The term "dual rate contract arrangement" as used herein means a practice whereby a conference establishes tariffs or rates at two levels the lower of which will be charged to merchants who agree

The parties agree that for the two year life of that statute, and for the purposes of this case, the effect of the Act is to make the Isbrandtsen decision or its reasoning not applicable to this case.

Before coming to what we consider the heart of this case, we notice some of the preliminary contentions of the petitioners.

■ One such contention questions the Board's determination that the shippers' rate agreement, as presently interpreted by the Conference, requires specific prior approval under § 15 of the Shipping Act. This, they say, is unwarranted for the reason that § 15 "does not require the filing or approval of contracts between common carriers and shippers."

Section 15 of the Shipping Act, (46 U.S.C.A. § 814), the full text of which is set forth in the margin,[9] provides that every common carrier by water shall file with the Board a true copy "of every agreement, with another such carrier or other person subject to this chapter, or modification or cancellation thereof, * * * fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; * * * or in any manner providing for an exclusive, preferential, or cooperative working arrangement." The section provides for disapproval, cancellation or modification of such agreements by the Board when it makes certain findings therein specified.

We think petitioners' position on this matter is not well taken. It is plain that such agreements as these between carriers and shippers are necessarily an in-

to ship their cargoes on vessels of members of the conference only and the higher of which shall be charged to merchants who do not so agree.'"

"Sec. 2. This Act shall be effective immediately upon enactment and shall cease to be effective on and after June 30, 1960."

9. "Every common carrier by water, or other person subject to this chapter, shall file immediately with the Federal Maritime Board a true copy, or, if oral, a true and complete memorandum, of every agreement, with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term 'agreement' in this *section includes understandings, confer-ences,* and other arrangements.

"The Board may by order disapprove, cancel, or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors or to operate to the detriment of the commerce of the United States, or to be in violation of this chapter, and shall approve all other agreements, modifications, or cancellations.

"Agreements existing at the time of the organization of the Board shall be lawful until disapproved by the Board. It shall be unlawful to carry out any agreement or any portion thereof disapproved by the Board.

"All agreements, modifications, or cancellations made after the organization of the Board shall be lawful only when and as long as approved by the Board, and before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation.

"Every agreement, modification, or cancellation lawful under this section shall be excepted from the provisions of sections 1–11 and 15 of Title 15, and amendments and Acts supplementary thereto.

"Whoever violates any provision of this *section shall be liable to a penalty* of $1,000 for each day such violation continues, to be recovered by the United States in a civil action."

tegral part of any arrangement for an exclusive patronage contract/non-contract dual rate system. It is an agreement regulating transportation rates or fares or for receiving special rates, privileges or advantages within the plain language of § 15. The Board's regulations expressly provide that steamship fare conferences proposing to establish contract/non-contract rates, shall file certain statements with the Board containing "(d) copies of the form of all contracts pertaining thereto." (46 C.F.R. § 236.3.) This provision is referred to by the Supreme Court in Federal Maritime Board v. Isbrandtsen, supra, at 486.

We understand Isbrandtsen Co. v. United States, 93 U.S.App.D.C. 293, 211 F.2d 51, to hold that proposals for agreements between shippers and conference lines must be approved by the Board under § 15 and the regulation above referred to before a dual rate system may be initiated.[10]

River Plate and Brazil Conferences v. Pressed Steel Car Co., 2 Cir., 227 F.2d 60, dealt with an attempted action by a common carrier steamship conference upon an alleged contract or agreement between a shipper and the conference for damages sought because of a claimed breach of the contract by the shipper. The action was held unenforceable because the agreement had not been approved by the Board as required by § 15 of the Shipping Code.

We hold therefore that the shippers' rate agreement here involved is one subject to the provisions of § 15.

 The petitioners also complain of the action of the Board in refusing to permit Mitsui to compromise its dispute

and drop its charges before the Board. They allude to the provisions of § 5(b) of the Administrative Procedure Act, (5 U.S.C.A. § 1004(b)), directing agencies to afford parties an opportunity to settle or adjust disputes. They assert that § 22 of the Shipping Act, (46 U.S.C.A. § 821), limits the Board's independent investigation or inquiry in matters of this kind to cases where a complaint filed before it is not satisfied.[11]

We cannot agree that the Board is so limited. In fact § 22 also provides that "The Board, upon its own motion, may in like manner * * * investigate any violation of this chapter." In Isbrandtsen Co. v. United States, D.C., 96 F.Supp. 883, which was a review of an order of the Federal Maritime Board under the former procedure by a three-judge court, the court had occasion to comment upon the duty of such an agency to take action on its own motion as a representative of the public in investigating alleged violations of the Act, saying that it should not limit itself to acting as a mere referee to determine the contentions of adversary parties.[12]

The circumstances relating to the attempted withdrawal of its complaint by Mitsui gave rise to a further contention of the petitioners to the effect that the decision of the Board was based upon claims, charges and contentions of which petitioners had no proper notice. Petitioners say that when Mitsui filed its complaint against them, it charged that their practices were such they were depriving consignees of the shippers of their right to ship over Mitsui vessels; that they were coercing such consignees to ship exclusively on conference vessels;

---

10. See the comment upon this case in Isbrandtsen Co. v. United States, 99 U.S. App.D.C. 312, 239 F.2d 933, at page 936.

11. "If the complaint is not satisfied the Board shall, except as otherwise provided in this chapter, investigate it in such manner and by such means, and make such order as it deems proper."

12. " 'They are not expected merely to call balls and strikes, or to weigh the

evidence submitted by the parties and let the scales tip as they will. The agency does not do its duty when it merely decides upon a poor or nonrepresentative record. As the sole representative of the public, which is a third party in these proceedings, the agency owes the duty to investigate all the pertinent facts, and to see that they are adduced when the parties have not put them in.' " 96 F.Supp. at page 892.

and that such coercion was causing the diversion of cargo from the complainant.

Petitioners point out that the Board found that there was no evidence of any actual loss by discrimination against Mitsui; that there was no evidence that any foreign consignee was coerced or suffered any loss or injury. In effect, said petitioners, the Board found against Mitsui on the charges made by it, but then proceeded, without any new charges or any further notice to the petitioners, to make an order based upon a completely new ground of complaint, namely, that the Conference was operating under an interpretation of its agreement which had never been approved by the Board as required by § 15 of the Act.

Petitioners contend that had they been furnished an opportunity to do so, they might have produced much testimony to disprove the Board's findings as to a proper interpretation of the agreement and as to a claimed new interpretation on their part.

Since we shall first inquire whether the Board's own findings support its order, we shall defer discussion of this point until later in the opinion.

It will be useful at this point to note the precise language in which the Board laid down its ruling in its cease and desist order. The operative portions of that order are as follows: "It is ordered, That the Pacific Coast European Conference and its members, as named in Appendix A hereto, cease and desist from effectuating any interpretation of said Conference's Shippers Rate Agreement

inconsistent with the interpretation set forth in the report herein." The Board's interpretation there referred to is stated in the body of the report as follows:

"We consider that the commercial custom of considering F.O.B. and C.I.F. shipments to be those of the buyer and seller respectively, recognized in the Revised American Foreign Trade Definitions, is derived from an analysis of the rights of the parties similar to our own. It is significant to renote that in the 'Comments on All F.O.B. Terms' where the seller obtains the ocean space and marine insurance, he is considered to have acted 'for the buyer' and 'on behalf of the buyer.'

"Whether the actual selection is made by the buyer or by the seller in such case, it is nevertheless made for the buyer who is the shipper in such sales, except as herein noted where security title is reserved, and should appear on the ocean bill of lading as such.

"Our view of F.O.B. and C.I.F. transactions disposes of the issue as to whether F.O.B. shipments are included in the phrases 'all of its shipments' and 'all export shipments of the shipper' appearing in Article 1 of the Shippers' Rate Agreement. We find in consonance with the foregoing that goods sold by a signatory exporter on an F.O.B. basis are not included within the meaning of the phrase unless the exporter retains a security title to the goods sold."

Article 1 of the Shippers' Rate Agreement to which reference is there made is set forth in full in the margin.[13] It will

13. "1. In consideration of the mutual covenants herein contained and the contract rates as shown in the applicable tariff of the Pacific Coast European Conference, hereinafter called the Conference, the Shipper agrees to offer or cause to be offered for transportation on vessels of the Carriers from Pacific Coast ports of the United States and Canada to ports of call in Great Britain, Northern Ireland, Ireland, Continental Europe, Scandinavia, and French Morocco and on the Mediterranean Sea and other seas bordering thereon (except the Black Sea) all of its shipments by water

on which said contract rates are applicable. The contract rates, and the rules, regulations and conditions applicable thereto, as shown in the applicable Conference tariff, shall govern to the ports of destination as set forth in said tariff.

"This agreement covers all export shipments of the Shipper (excluding shipments via Intercoastal vessels), to aforesaid countries moving via any Pacific Coast port of the United States or Canada. All such shipments shall be tendered to the Carriers for their vessels which may load at any Pacific Coast port of the United States or Canada

thus be noted that the Board ruled that when the signatory shipper agreed to offer or cause to be offered for transportation on vessels of the Conference carriers "all of its shipments by water on which said contract rates are applicable," and agreed that "this agreement covers all export shipments of the shipper * * * to the aforesaid countries," it had no application whatever to shipments made as a result of F.O.B. transactions; that this was true whether the actual selection of a carrier was made by the buyer or by the seller,—the only exception was where the exporter retained a security title to the goods sold.

A substantial portion of the Board's report is given over to its interpretation of the text of the Shippers' Rate Agreement. It came up with its conclusion, previously stated, by noting that the agreement refers to the shipper and *"all of its shipments by water,"* and to "all export shipments of the shipper." (Emphasis supplied.) The Board then cited and quoted from court decisions and text writers dealing with F.O.B. sales, and considered whether buyer or seller, in such cases, has the duty of selecting the carrier. The Board noted some conflict in the decisions on this point,[13a] but thought the "apparent conflict" could be "readily reconciled", citing as authority for this 2 Williston on Sales, § 280(a). (However, the section cited and quoted does not appear to mean what the Board thought it did.) In the view of the Board all this added up to what it expressed as follows: "But since the goods are presumptively delivered to the buyer at ship's rail, it presumptively is the buyer who has the right to designate the bailee. Accordingly, although the right to select may be delegated to the seller, if the seller does not maintain a security title to the goods, the selection of a carrier in an F.O.B. shipment is made on behalf of the buyer and the shipment is therefore the shipment of the buyer."

We are of the opinion that the Board's interpretation of the meaning of the written instrument is too rigid; that it disregards legal rules commonly applied in the construction of legal writings. We think the Board's order involves an oversimplification of what transpires when goods are exported, and transported by ship, and that this appears from the Board's own report.

The report repeatedly refers to the fact that in F.O.B. transactions it is by no means true that the buyer always selects the carrier. Who selects the carrier depends in each case, upon the conditions and circumstances of the particular sale. Thus the Board makes frequent allusions to the fact that often the seller, under an F.O.B. arrangement, actually selects the carrier, either because such an understanding is a part of the deal, or because the buyer makes no attempt to claim a right of selection. Thus the Board, placing much reliance upon the Revised American Foreign Trade definitions, adopted by a group of commercial and trade organizations, quotes therefrom the following: "Despite this obligation on the part of the buyer, [under F.O.B. terms] in many trades the seller obtains the ocean freight space, and marine and war risk insurance, and provides for

---

and are scheduled to sail to any ports of call in the aforesaid countries. Failure to so tender any such shipments to the Carriers or shipment of them by vessels other than those of the Carriers shall constitute a violation of this agreement. In agreeing to so confine the carriage of its (their) shipments to the vessels of the Carriers the Shipper hereby promises and declares it is the intent and purpose to do so without evasion or subterfuge either directly or indirectly by any means, including the use of intermediaries or subsidiaries."

13a. "In F.O.B. sales, it has been said, on the one hand, that the prima facie effect of the phrase F.O.B. is that the buyer must select the carrier, and on the other hand it has been held each case must rely upon its own facts in determining which party to a sale has the duty to secure transportation. Still other decisions find the buyer to be under a duty to furnish or designate a carrier in F.O.B. sales."

shipment on behalf of the buyer. Hence, seller and buyer must have an understanding as to whether the buyer will obtain the ocean freight space, and marine and war risk insurance, as is his obligation, or whether the seller agrees to do this for the buyer." [14]

■ It seems plain to us that under the terms of the shippers' rate agreement in any case where the signatory seller actually has the choice and does choose the carrier, even though he may have sold F.O.B., he is bound to choose a Conference carrier. We so hold.[15] Whether the agreement may have an even more inclusive operation is something we are not required to decide at this point.

What has been said so far discloses that the order of the Board must be vacated and the proceedings must be remanded for further action by the Board.

■ We realize that upon this review of an administrative order our power to give directions to the Board as to its further proceedings is something quite different from that which we might exercise were this a review of a court's judgment. In the latter case we could remand the cause and "require such further proceedings to be had as may be just under the circumstances." Title 28 U.S.C. § 2106. But when our judgment here entered returns this matter to the Board, it will be functioning not as a court but as an administrative body carrying out functions delegated to it by Congress; and the members of the Board from here on out will "have power themselves to initiate inquiry, or, when their authority is invoked, to control the range of investigation in ascertaining what is [necessary] to satisfy the requirements of the public interest * * *." Federal

14. Compare the following statement in the Report: "Obviously, where common rather than private carriage is contemplated, the parties to a sale may agree, consistent with the presumption of delivery arising from the use of the term F.O.B., that either buyer or seller may select the carrying vessel." Also, "[I]n F.O.B. sales the selection of the carrier is, as hereinabove indicated, a matter of variable intention between buyer and seller."

During the argument the following colloquy occurred between the court and counsel for the board:

"Judge Pope: Well, I am bothered by that bad faith business. Suppose that I am a manufacturer of sugar in California and I want to sell a quantity of sugar in Germany. I send my salesman to Germany and the buyer over there says, 'What kind of a deal can you make?' 'Well, we'll offer you so much F.O.B. California,' some port here. 'That's the price.' 'Well, what's it going to cost me to get it over here?' 'Well, we are a member of the Conference and we are entitled to the lower of the dual rates, and if we appear as the shipper on the bill of lading, we can get this lower rate.' So the buyer says, 'Well, that sounds pretty good to me, I will have to pay the freight, let's do it that way.'

"Now, as I understand the attitude of the Board, it is that you can't do that?

"Mr. Aptaker: No, the attitude of the Board is not that. The attitude of the Board is that you can do that. The F.O.B. sale arouses the presumption that the buyer will be able to choose the carrier.

"Judge Pope: That may be the presumption in any given case; they might agree what the carrier is, then they will both participate in the selection of the carrier.

"Mr. Aptaker: That's correct. The parties are free to alter that presumption, of course, and to depart from it by agreement. And they are free under any terms of sale, really, to make as part of the sales agreement a provision as to who will choose the carrier. There is nothing wrong with that. Under the situation that I named, the Conference is going to lose some of the higher rates that it would collect if the buyer in Europe were shown as the shipper, and, consequently, the buyer and the seller are going to get together and say exactly what you supposed that they might say. There is nothing wrong with that."

15. This is not a matter on which the Board can be said to have special competence. "When the words of a written instrument are used in their ordinary meaning, their construction presents a question solely of law." Great Northern Ry. v. Merchants Elev. Co., 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943. Cf. Securities and Exchange Commission v. Cogan, 9 Cir., 201 F.2d 78, at pages 85–86.

Communications Commission v. Pottsville Broadcasting Company, 309 U.S. 134, 142–143, 60 S.Ct. 437, 441, 84 L.Ed. 656.

It is true that under § 10(e) of the Administrative Procedure Act, (5 U.S.C.A. § 1009(e)), we may "compel agency action unlawfully withheld or unreasonably delayed", but that is of course subject to the proposition expounded in the case last cited that from henceforth the Board will be free to prosecute its inquiries in a manner not limited by any mandate from this court.

It is not amiss for us to indicate at this point further reasons why we think that the Board's decision cannot stand, and why it has misconceived its proper function in rendering the decision here under review. In the first place, the cease and desist order is directed exclusively to an asserted "interpretation" by the Conference of its Shippers' Rate Agreement. After holding that the Conference has placed a certain interpretation upon that agreement the Board both disagrees with the interpretation and says that the interpretation cannot be enforced because it has not had prior approval by the Board.

It appears to us that in treating this as the problem before it, the Board was treading upon doubtful ground. The complaint on which the petitioners were summoned to appear for hearing contained no allegation that respondents were enforcing an interpretation of their agreement which had not been filed with or approved by the Board.[16] The intervenor's petition also fails to supply this deficit. Had the respondents been served with a complaint (a) alleging that the Conference had made a new interpretation of its agreement; (b), setting out what that interpretation was; (c) alleging that this differed from the agreement as approved; and (d), that this new interpretation or modification operated to the detriment of the commerce of the

United States, the respondents would have had a fair chance to produce evidence in support of their contrary contention. This contention is that the Shippers' Rate Agreement is one made with a shipper as such; that a shipper is one who contracts for the carriage of goods; and that whether the shipper who thus contracts is a buyer or seller, or whether he has title or not, is irrelevant so long as he is a shipper.

When the Board turned up with a report which was based upon a finding of a lack of approval of a new Conference interpretation without a prior joinder of issue upon such a question, it was but natural that the present record as to the Conference's construction of its agreement is most unsatisfactory. As indicated in footnote 5, supra, the Board based its finding as to the Conference's interpretation upon the statement of the Conference chairman. It would appear to us that "construction" or "interpretation" must be something besides conversation. If the Conference actually enforced against a shipper or shippers a particular interpretation of its agreement and evidence to that effect were produced, that would furnish solid evidence of what the construction or interpretation was.

But the record before us, sketchy as it is, because of lack of hearing upon a stated or framed issue, would tend to indicate that the Conference's own construction of its Shippers' Rate Agreement was substantially different from that which the Board found it to be.

The report quotes from a 1949 letter written by the Conference to Pacific Coast Borax, the signer of one of its rate agreements in which it said: " * * * the shippers rate agreement employed by this conference is not violated by a shipper who has sold goods to a foreign importer on F.A.S. terms whereby title to the goods is taken by the importer at ship's side or prior thereto and the goods are shipped by a non-conference line in

16. It is true that the Mitsui complaint alleged generally that the actions of the Conference members were "in violation of § 14 Third, 15, 16, and 17 of said Act", but that gave no suggestion of a claim of a new interpretation of the Shippers' Rate Agreement which respondents had neglected to file.

the name of the importer with the contract shipper's name not appearing on any shipping documents in connection with the shipments. It is the opinion of the conference attorneys that under such circumstances, the contract shipper is not in fact the shipper of the cargo but that the shipper is the foreign importer, who, if not bound by a shippers' rate agreement with this conference, is not required to ship via conference lines."

The findings show that in March, 1955, the Conference by letter advised 15 borate shippers that it interpreted the agreement as applying to all export shipments of contract signatories regardless of the terms of sale. The Conference started to collect liquidated damages from some of those shippers and there was a move to terminate some of those agreements but nothing ever came of this. Stauffer Chemical Company sold products which were moved by Mitsui vessels. Stauffer was given notice of cancellation of its agreement but the notice was withdrawn.

All this is consistent with the Board's finding that "No injury to any exporter has been shown to have resulted from Conference termination of the exporter's right to contract rates in circumstances where a shipment of the exporter has moved via non-conference vessel under F.O.B. or F.A.S. terms. * * * There is no evidence before us of any actual loss by specific discrimination against Mitsui, nor is there evidence that any foreign consignee has been coerced or prejudiced or has in fact suffered any loss or injury as a result of conference action."

As the matter now appears to us, it would seem that notwithstanding the Conference has at times made moves in the direction of insisting that a signatory shipper has violated the Shippers' Rate Agreement even if the purchaser buying under an F.O.B. arrangement has himself engaged the carrier which is a non-conference vessel, yet in every such case the Conference has yielded and taken a position consistent with that which it now asserts has always been its stand, namely, that regardless of the terms of sale, whether C.I.F. or F.O.B., the signatory shipper is bound to comply with the contract if under the circumstances of the particular transaction that signatory shipper makes the choice of vessel.

Certainly upon further hearing of this matter the Board will be in a position to give the petitioners and other interested parties the opportunity to establish precisely what the Conference's construction or interpretation is,—in short, to determine with exactitude what arrangement has been made and enforced. At that stage the Board would then find itself in a position to perform the function entrusted to it by § 15. That would not involve a mere issuance of a cease or desist order based on a failure to file, for by that time the Board would have before it not only the text of the shippers' rate agreement, as it is at present, but precise information as to the intended meaning of every term.[17]

Upon such a record the Board could then proceed to carry out its duties as follows: It could inquire whether the arrangement in question was "unjustly discriminatory or unfair as between carriers, shippers, exporters, importers or * * * operates to the detriment of the commerce of the United States."[18] Un-

---

17. The Board's decision in the case cited in footnote 4, supra, furnishes an illustration of the manner in which initial objections to an agreement were treated as removed by corrections effected pending the proceedings before the Board. Page 17 of that report mentions two such objections which, in each case, were "removed" by actions taken during the pendency of the case.

18. We would expect the Board to devote its efforts toward a solution of these ultimate questions, rather than to a mere determination of a failure to file. It is after the Board is in possession of the facts of an agreement that its real work should begin: the ascertainment whether the arrangement is discriminatory or unfair or detrimental to commerce in the sense of the statute.

less such a finding be made, the Board must approve the agreement, for the section provides that the Board "shall approve all other agreements, modifications or cancellations."

The order of the Board is set aside and the proceedings are remanded for such other and further action of the Board as shall not be inconsistent with this opinion.

HEALY, Circuit Judge.

I concur dubiously in the result.

At that point important problems dealing with the economics of the shipping business will emerge. If it can be said that, at least since August 12, 1958, Congress favors dual rate arrangements, what practical effect would a permanent ruling such as the Board has made have upon the effectiveness of the Congressional policy? If, as suggested by petitioners, the great majority of all shipments are made F.O.B. would such a ruling tend to make the Conference impotent to secure the contemplated benefits of the dual rate system?

On the other hand, if the Conference were to insist upon an agreement which clearly required signatory shippers in all cases to refuse to deal with a foreign buyer who insisted on selecting the carrier for goods he sought to purchase F.O.B., the question might arise whether such limitations would tend unduly to lose business for American exporters, or lessen their capacity to compete in the world market.